## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------------------

RUTH CALDERÓN-CARDONA, individually and as : \
personal representative of the ESTATES OF : \
CARMELO CALDERÓN-MOLINA and : \
ELADIA CARDONA-ROSARIO : \
1008 Calle Los Angeles : \
Urb. Del Carmen : \
San Juan, PR 00923 : \
          : \
     and :  **Civil Action No.: 08-1367(FAB)** \
          : \
LUZ CALDERÓN-CARDONA : \
408 Calle Pedro Díaz : \
Urb. Del Carmen : \
San Juan, PR 00923 : \
          : \
     and: : \
          : \
LUIS CALDERÓN-CARDONA : \
Calle 11, RF-9 : \
El Conquistador : \
Trujillo Alto, PR 00976 : \
          : \
     and : \
          : \
GLORIA CALDERÓN-CARDONA : \
Calle 433, Bloque 156, Lote 11 : \
Villa Carolina, PR 00985 : \
          : \
     and : \
          : \
JOSÉ RAÚL CALDERÓN CARDONA : \
Laguna Gardens II, Apt. A-4 : \
Urb. Los Angeles : \
Carolina, PR : \
          : \
     and : \
          : \
ANA DELIA CALDERÓN-CARDONA : \
408 Calle Pedro Diaz : \
Urb. Del Carmen : \
San Juan, PR 00923 : \
          :

and                                                          :
                                                             :
HILDA CALDERÓN-CARDONA                                       :
Paisajes de Escorial S-10                                    :
Carolina, PR 00987                                           :
                                                             :
         and                                                 :
                                                             :
ANGEL CALDERÓN-GUZMAN and MIGUEL                             :
CALDERÓN-GUZMAN as personal representatives of the :
ESTATE OF MIGUEL CALDERÓN-CARDONA                           :
Calle Pedro Diaz Correa #408                                 :
Urb. Del Carmen                                              :
San Juan, PR 00923                                           :
                                                             :
         and                                                 :
                                                             :
SALVADOR CALDERÓN- MARTÍNEZ                                  :
Calle Cuba #457                                              :
Hato Rey, PR 00917                                           :
                                                             :
         and                                                 :
                                                             :
PABLO TIRADO-AYALA                                           :
Road 643                                                     :
Km 2.3 Interior                                              :
Bo. Pugnado. Manati, PR 00674                                :
                                                             :
         and                                                 :
                                                             :
ANTONIA RAMIREZ-FIERO                                        :
Road 643                                                     :
Km 2.3 Interior                                              :
Bo. Pugnado. Manati, PR 00674                                :
                                                             :
                            Plaintiffs,                      :
                                                             :
           vs.                                               :
                                                             :
DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,                       :
a.k.a. NORTH KOREA                                           :
Ministry of Foreign Affairs                                  :
c/o Foreign Minister, Paek Nam Sun                           :
Jung song-dong, Central District                             :
Pyong Yang, DRK                                              :
                                                             :

```
                and                              :
                                                 :
CABINET GENERAL INTELLIGENCE BUREAU,             :
a.k.a. NORTH KOREAN INTELLIGENCE SERVICE         :
c/o Foreign Minister, Paek Nam Sun               :
Jung song-dong, Central District                 :
Pyong Yang, DRK                                  :
Office of the General Secretary of the Korean Workers'  :
Party.                                           :
                                                 :
                and                              :
                                                 :
JOHN DOES 1-10,                                  :
                                                 :
                Defendants.                      :
-----------------------------------------------------------------X
```

## COMPLAINT

Plaintiffs, by their attorneys, complain of the defendants and allege the following upon information and belief:

## INTRODUCTION

1. This is an action for wrongful death, personal injury and related torts, pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*., brought by the estate and families of United States nationals who were murdered or otherwise harmed as the result of a terrorist attack at Israel's Lod Airport on May 30, 1972 (the "Terrorist Attack").

2. The Terrorist Attack was carried out by the Japanese Red Army ("JRA") and the Popular Front for the Liberation of Palestine ("PFLP") terrorist organizations. The JRA and PFLP planned and executed the Terrorist Attack using material support and resources, within the meaning of 18 U.S.C. § 2339A, provided by the defendants, the Democratic People's Republic of North Korea ("North Korea") and North Korea's Cabinet General Intelligence Bureau ("CGIB"), and their officials, employees, and agents.

## JURISDICTION

3.     This Court has jurisdiction over this matter and over the defendants pursuant to 28 U.S.C. §§ 1330(a), 1330(b), 1331, 1332(a)(2) and 1605A(a)(1), which create subject-matter and personal jurisdiction for civil actions for wrongful death and personal injury against state sponsors of terrorism and their officials, employees and agents.

## NATURE OF THE ACTION

### The Massacre at the Lod Airport

4.     On May 30, 1972, American citizens Carmelo Calderón-Molina ("Carmelo") and Pablo Tirado-Ayala ("Pablo") arrived at Israel's Lod Airport near Tel Aviv, as part of a large group of Puerto Rican pilgrims visiting the Christian religious sites in the Holy Land.

5.     Pablo left the baggage claim area and walked toward the restrooms. While Carmelo waited at the baggage claim area to retrieve his luggage from the baggage carousel and pass through Israeli customs, three members of the JRA, who had just disembarked from a flight arriving from Italy, removed automatic weapons and grenades from their luggage.  The terrorists began firing indiscriminately at Carmelo and other passengers waiting in the luggage area, as well as at Pablo and others in the adjacent areas.

6.     The JRA attackers ran through the airport terminal randomly firing weapons and throwing grenades.

7.     Two of the terrorists eventually ran out of ammunition and were killed by their own hand grenade blasts.

8.     The last attacker, Kozo Okamoto, attempted to kill himself by throwing a grenade at a nearby airplane in an attempt to detonate both himself and the plane.  Okamoto did not succeed in either of his goals and was eventually subdued by an airport employee and arrested by

Israeli police.

9.      When the Terrorist Attack had stopped, more than twenty-six passengers had been murdered by the JRA terrorists and more than eighty other civilians had been wounded.

10.     The murdered victims included seventeen Puerto Rican pilgrims, among them Carmelo Calderón-Molina.  Plaintiff Pablo Tirado-Ayala was among the many injured in the Terrorist Attack.

11.     Israeli investigators took the surviving attacker, Kozo Okamoto, into custody and later identified the two dead JRA terrorists as Yasuyuki Yasuda and Takeshi Okudaira. Okudaira was the husband of Fusako Shigenobu, the leader of the JRA at the time.

12.     During subsequent interrogations Okamoto admitted that he and his fellow attackers were members of the JRA and that the attack had been carried out in conjunction with the PFLP.

13.     The PFLP also publicly claimed responsibility for the attack, and this was widely reported in the international press.

## THE PARTIES

### A.    The Plaintiffs

14.     Plaintiffs Ruth Calderón-Cardona, Luz Calderón-Cardona, Luis Calderón-Cardona, Gloria Calderón-Cardona, José Raúl Calderón-Cardona, Ana Delia Calderón-Cardona, Hilda Calderón-Cardona, Salvador Calderón-Martínez are, and on May 30, 1972 were, nationals of the United States and residents of Puerto Rico.  They are the children of U.S. citizens Carmelo Calderón-Molina and Eladia Cardona-Rosario.

15.     Miguel Calderón-Cardona was a national of the United States and resident of Puerto Rico on May 30, 1972.  Miguel Calderón-Cardona died in 1982.

16.     Plaintiff Ruth Calderón-Cardona brings this action individually and on behalf of the estates of her parents, Carmelo Calderón-Molina and Eladia Cardona-Rosario.

17.     Carmelo Calderón-Molina, then 77 years old, was among the group of pilgrims from Puerto Rico visiting the Holy Land.

18.     Carmelo Calderón-Molina was shot during the Terrorist Attack.  He suffered a laceration to his heart, internal bleeding and broken ribs, and died at the scene.  It is believed that Carmelo Calderón-Molina was in the process of protecting others when he was shot and killed. At the time of his murder he was married to Eladia Cardona-Rosario, who survived him by over thirty years.

19.     On the day of the attack, plaintiff Gloria Calderón-Cardona was listening to the radio and learned that the attack had taken place.  She also heard her father's name listed among those killed.  She telephoned her siblings to inform them that their father had been murdered.

20.     As a result of Carmelo Calderón-Molina's murder, his wife Eladia Cardona-Rosario experienced emotional pain and suffering, loss of her husband's society, companionship, comfort, advice and counsel, and suffered severe mental anguish and extreme emotional distress for a period of over thirty years until she passed away at the age of 92.

21.     As a result of Carmelo Calderón-Molina's murder, plaintiffs Ruth Calderón-Cardona, Luz Calderón-Cardona, Luis Calderón-Cardona, Gloria Calderón-Cardona, José Raúl Calderón-Cardona, Ana Delia Calderón-Cardona, Hilda Calderón-Cardona, and Salvador Calderón-Martínez have experienced emotional pain and suffering, loss of their father's society, companionship, comfort, advice and counsel and have suffered severe mental anguish and extreme emotional distress.  Prior to his death, Miguel Calderón-Cardona experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel and

had suffered severe mental anguish and extreme emotional distress.

22.     Angel Calderón-Guzman and Miguel Calderón-Guzman are nationals of the United States and residents of Puerto Rico.  They are the children of Miguel Calderón-Cardona. They bring this action on behalf of the Estate of Miguel Calderón-Cardona.

23.     Plaintiff Pablo Tirado-Ayala is, and on May 30, 1972 was, a national of the United States and resident of Puerto Rico.  Pablo Tirado-Ayala was among the group of pilgrims from Puerto Rico at the Lod Airport at the time of the Terrorist Attack.

24.     As a result of the attack, Mr. Tirado-Ayala sustained a wound to his foot and experienced severe emotional distress and mental anguish.

25.     Plaintiff Antonia Ramirez-Fiero is, and on May 30, 1972 was, a national of the United States and resident of Puerto Rico.  She is the wife of plaintiff Pablo Tirado-Ayala.

26.     As a result of the attack and the resulting severe emotional distress caused her husband, Antonia Ramirez suffered loss of companionship and her husband's society and severe mental anguish and extreme emotional distress.

**B.     The Defendants**

27.     At all times relevant to this Complaint, defendant North Korea is and was a foreign state within the meaning of 28 U.S.C. § 1603, designated as a state sponsor of terrorism pursuant to § 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)).  North Korea provided material support and resources for the commission of acts of extrajudicial killing, within the meaning of 28 U.S.C. § 1605A, including the Terrorist Attack, and performed actions that caused the Terrorist Attack and the harm to the plaintiffs herein.  The government of North Korea is politically and ideologically hostile to the United States and its allies, and has consistently sponsored acts of international terrorism.

28.     At all times relevant to this Complaint, defendant CGIB is and was defendant North Korea's main intelligence and security agency tasked with conducting espionage, analyzing intelligence and carrying out hostile operations against North Korea's foreign opponents, including maintaining support for numerous international terrorist organizations.  At all times relevant to this Complaint the CGIB was an official North Korean government agency reporting directly to North Korea's supreme leader, the General Secretary of the Korean Workers' Party.  Within the scope of its agency and office, the CGIB provided material support and resources for the commission of acts of extrajudicial killing, within the meaning of 28 U.S.C. § 1605A, including the Terrorist Attack, and performed actions that caused the Terrorist Attack and the harm to the plaintiffs herein.

29.     At all times relevant to this Complaint, defendants John Does 1-10 are and were officials, employees and agents of North Korea, who within the scope of their office, employment and agency provided material support and resources for the commission of acts of extrajudicial killing including the Terrorist Attack, and performed actions that caused the Terrorist Attack and harm to the plaintiffs herein.

## FACTUAL ALLEGATIONS

### The Popular Front for the Liberation of Palestine

30.     The PFLP is a Palestinian terrorist organization founded by George Habash as a break-away faction of the Arab Nationalist Movement in 1967.  The PFLP professes a Marxist-Leninist ideology and engages in terrorist attacks against the State of Israel.  The PFLP is committed to carrying out its terror attacks as part of what it views as a broader revolutionary war against "Western imperialism."

31.     The United States government has designated the PFLP a Foreign Terrorist

Organization ("FTO"), a Specially Designated Terrorist organization ("SDT"), and a Specially Designated Global Terrorist organization ("SDGT").

**The Japanese Red Army**

32.     The JRA is a Japanese terrorist organization that was formed by radical students in Japan circa 1970.  The JRA was founded as a break-away faction of the Japanese Communist League-Red Army Faction by dissident members who sharply disagreed with the non-violent direction of the parent organization.

33.     The JRA's historical goal has been to overthrow the Japanese government and monarchy and to help foment world revolution through the use of violence and terrorist attacks.

34.     One of the JRA's founding leaders, Fusako Shigenobu, lobbied the organization to expand its terrorist activities to stretch far beyond the borders of Japan and to internationalize the target of its violence to include all Western governments.

35.     In keeping with the JRA's ideology as an anti-Western terrorist organization, Shigenobu declared that the forefront of the JRA's battle against international imperialism should be in "Palestine" and focused against the Israeli government.

36.     In an effort to forge a connection between the JRA and the PFLP, Shigenobu traveled from Japan to Beirut, Lebanon in 1971 and made contact with the PFLP's leadership.

37.     Another of the founding leaders of the JRA was Takeshi Okamoto.  Along with his younger brother Kozo, Takeshi attended JRA conferences that were held for several days in Japan in early 1970, and which were instrumental in launching the organization's radical agenda and setting it on the course of committing acts of terrorism to advance its radical ideology.

**Defendant North Korea Has Routinely Provided Material Support to the JRA and PFLP**

38.     Defendant North Korea provided the JRA with lodging, safehouses, funding,

weapons, military training and other material support prior to the Terrorist Attack on May 30, 1972 that killed Carmelo Calderón-Molina and injured the plaintiffs.

39.     Several JRA terrorist leaders, including Takeshi Okamoto, took refuge in North Korea following a March 1970 hijacking of a Japan Airlines flight.  In fact, the government of North Korea provided the JRA terrorist leadership with lodging, safehouses, facilities, communications equipment, and transportation which enabled the JRA to plan and carry out terrorist attacks.  Following the 1970 hijacking, North Korea became a key operations center and international base for the JRA.

40.     The government of North Korea provided its assistance and material support to the JRA through its intelligence service, the CGIB, an agency and instrumentality of North Korea.

41.     The safe haven and support that North Korea provided the JRA terrorist leadership has been a fierce point of contention between North Korea and Japan.

42.     After the Terrorist Attack, Israeli security agencies began to closely investigate the links between North Korea, the JRA and the PFLP.

43.     The North Korean government trained members of the PFLP and other terrorist organizations in the 1960s and 1970s, and this training was conducted in, among other places, North Korea, Lebanon, and the People's Democratic Republic of Yemen (a.k.a. South Yemen, a state in present-day southern Yemen that united with the Yemen Arab Republic in 1990 to form the current Republic of Yemen).

44.     In September 1970, George Habash, PFLP's leader, traveled to North Korea where he met with North Korean officials and received assurances of North Korean support for the PFLP.  During this visit, which occurred under the auspices of the North Korean government,

George Habash was introduced to nine senior members of the JRA terrorist leadership who were being sheltered by and operating in North Korea.

45.     As a result of this meeting between George Habash and the JRA leadership, an agreement was reached whereby the PFLP and JRA would cooperate in future joint terrorist attacks and propaganda efforts.

46.     Thereafter, North Korean government instructors provided guerilla warfare training and other expert advice and guidance on terrorism to members of the PFLP and the JRA in the PFLP's training bases in the Beka'a Valley in Lebanon.

47.     Prior to the Terrorist Attack, in the fall of 1971, Kozo Okamoto received a call from another JRA member who informed him that several JRA members would be accompanying a PFLP representative who would be visiting Japan.  Okamoto was told to help arrange a place for the showing of a film entitled, "Declaration of World War by the Red Army and the PFLP."

48.     In September 1971, Kozo Okamoto was also contacted by a JRA member who offered him the opportunity to travel to Beirut, Lebanon for guerilla warfare training to further the JRA's goals.  Because Kozo was eager to participate in the JRA's campaign of world revolution and to follow in the footsteps of his older brother, Takeshi Okamoto, now based in North Korea, Kozo Okamoto quickly agreed to undertake the training.

49.     Several months later, Kozo Okamoto was contacted by Takao Himori, a former college student and JRA member who had recently visited Beirut.  Himori provided Kozo with money for his trip to Lebanon.

50.     On or about February 26, 1972, Kozo Okamoto boarded a Canadian Pacific Airlines jet bound for Montreal.  He stayed one night in Montreal, and then traveled to New

York where he proceeded on to Paris and then finally to Lebanon.

51.     In Lebanon, Kozo Okamoto met the other two terrorists who would participate in the Terrorist Attack, Takeshi Okudaira and Yasuyuki Yasuda, as well as another member of the JRA, Osamu Maruoka, who would later carry out a number of international hijackings.

52.     These four JRA members were trained in guerilla warfare in the PFLP's terrorist camps in Lebanon, and were given expert advice in terrorism, and provided with other material support, by the PFLP and North Korea.

53.     After more than two months of training, Takeshi Okudaira informed Kozo Okamoto and Yasuyuki Yasuda that they were to carry out a suicide mission against Israel's Lod Airport to further world revolution, and they were briefed on the specifics of the attack and given false passports.  One of the dates of birth on these false passports corresponded with the date of the 1970 JRA hijacking to North Korea conducted by Kozo Okamoto's brother.

54.     After finishing their training in Lebanon, the three terrorists traveled through Europe and finally to Rome, where they stayed for several days and took photos of various tourist attractions, before departing for Israel to murder and maim innocent travelers.

55.     Following his arrest for the Terrorist Attack, Kozo Okamoto voluntarily confessed to Israeli security officials his role in the Terrorist Attack and the murder of twenty-six passengers.

56.     On July 18, 1972, an Israeli court found Kozo Okamoto guilty of the twenty-six murders and sentenced him to life imprisonment.

57.     In May 1985, Israel entered into a prisoner release agreement.  In exchange for the return of three Israeli soldiers captured during Israel's 1982 war in Lebanon, the Israeli government agreed to free 1,150 terrorist prisoners.

58.     Kozo Okamoto was released pursuant to this prisoner exchange agreement, and resurfaced at a press conference with Shigenobu in Libya.

59.     Upon information and belief, Kozo Okamoto thereafter traveled to North Korea where he resides today.

60.     During the period relevant hereto, defendant North Korea provided the JRA and PFLP with material support and resources within the meaning of 28 U.S.C. § 1605A, in order to facilitate and further the commission of terrorist attacks by the JRA and the PFLP such as the Terrorist Attack at Lod Airport.  Such support was provided routinely and in furtherance of a specific policy of terror sponsorship on the part of defendant North Korea.

61.     The material support and resources provided by defendant North Korea to the JRA and PFLP included: military and other training; training bases; facilities for, *inter alia*, training, storage of weapons and explosives and the maintenance and operation of a leadership command and operational infrastructure; safe haven; lodging; means of communication and communications equipment; financial services, including banking and wire transfer services; and means of transportation.

62.     The North Korean intelligence agency, CGIB, provided the material support and resources described herein to the PFLP and the JRA on behalf of defendant North Korea and in furtherance of North Korea's policies while acting within the scope of its office, employment, and agency.

63.     At all relevant times, defendant CGIB was an agent, representative and/or office of defendant North Korea acting within the scope of its agency and/or office.

64.     At all relevant times, the CGIB engaged in the actions described herein within the scope of its agency and/or office and to further the interests of defendant North Korea.

Accordingly, defendant North Korea is vicariously liable for the acts of the CGIB.

65.     John Does 1-10 are officials, employees, and/or agents of defendant North Korea who provided the material support and resources described herein to the PFLP and the JRA on behalf of defendant North Korea and in furtherance of North Korea's policies while acting within the scope of their office, employment and agency.   Accordingly, defendant North Korea is vicariously liable for the acts of John Does 1-10.

66.     During the period relevant hereto, defendants provided the JRA and the PFLP and its operatives with training bases and facilities on North Korean territory.

67.     The JRA and the PFLP and its operatives utilized the training bases and facilities provided by defendants to train for the commission of acts of terrorism.   This training included the use of firearms, explosives and other weapons.   The JRA and the PFLP and its operatives also utilized these bases and facilities as depots for storage of weapons and explosives.

68.     The JRA and the PFLP and its operatives also utilized the training bases and facilities provided by defendants to establish, maintain and operate a leadership command, organizational hierarchy and operational infrastructure.

69.     Additionally, at all times relevant hereto, defendants provided the JRA and the PFLP and its operatives with instruction and training in terrorism activities including the use of weapons and explosives (collectively: "Terrorist Training").

70.     Terrorist Training was provided to the JRA and the PFLP and its operatives by and through North Korean military and intelligence officials, and other agents, employees and officials of defendant North Korea acting under the command and direction of defendants.

71.     At all times relevant hereto, defendants provided the JRA and its leaders, officials, and operatives with lodging, safe haven, and shelter, in order to prevent them from

being apprehended and permit them to conduct their terrorist activities freely and unhindered.

72.     In order to facilitate and further the commission of terrorist attacks by the JRA and the PFLP, defendants gave substantial aid, assistance and encouragement to the JRA and the PFLP, and knowingly and willingly conspired, agreed and acted in concert with one another and with the JRA and the PFLP, in pursuance of a common plan and design, to provide material support and resources to the JRA and the PFLP.

73.     Defendants' provision of material support and resources, as defined by 18 U.S.C. § 2339A, to members of the JRA and PFLP caused and facilitated the Terrorist Attack.

**FIRST CLAIM FOR RELIEF**
**AS AGAINST ALL DEFENDANTS ON BEHALF OF ALL PLAINTIFFS**
**ACTION FOR DAMAGES UNDER 28 U.S.C. § 1605A(c)**

74.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

75.     North Korea is a foreign state that at all relevant times has been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

76.     North Korea and the other defendants provided material support and resources, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Terrorist Attack.

77.     Defendants CGIB and John Does 1-10 are officials, employees, and/or agents of North Korea, and they provided the material support and resources which caused and facilitated the Terrorist Attack within the scope of their office, employment and/or or agency.

78.     The Terrorist Attack was an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

79.     Decedent Carmelo Calderón-Molina was murdered in the Terrorist Attack.  The murder of Carmelo Calderón-Molina caused decedent, his estate, his widow Eladia Cardona-

Rosario, plaintiffs Ruth Calderón-Cardona, Luz Calderón-Cardona, Luis Calderón-Cardona, Gloria Calderón-Cardona, José Raúl Calderón-Cardona, Ana Delia Calderón-Cardona, Hilda Calderón-Cardona, Salvador Calderón-Martínez, and Miguel Calderón-Cardona to suffer severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

80.     Plaintiff Pablo Tirado-Ayala suffered severe physical and psychological injuries as a result of the Terrorist Attack including pain and suffering; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; loss of solatium; and pecuniary loss and loss of income.

81.     The injuries suffered by plaintiff Pablo Tirado-Ayala caused plaintiff Antonia Ramirez-Fiero severe harm, including: loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; loss of solatium; and pecuniary loss and loss of income.

82.     The harm and injuries suffered by the decedents and the plaintiffs due to the Terrorist Attack were the direct and proximate result of defendants' conduct described herein.

83.     Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages under 28 U.S.C. § 1605A(c), in such sums as may hereinafter be determined.

84.     Defendants' conduct was criminal in nature, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## SECOND CLAIM FOR RELIEF
## AS AGAINST ALL DEFENDANTS
## ON BEHALF OF THE ESTATE OF CARMELO CALDERÓN-MOLINA
## WRONGFUL DEATH

85.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

86.    Defendants provided material support and resources to the JRA in order to facilitate and further the commission of terrorist attacks by the JRA and its operatives.  Decedent Carmelo Calderón-Molina was killed by gunshots and resulting injuries from the attack by the JRA and its operatives acting with the material support, resources and sponsorship of defendants.

87.    Defendants' actions were willful, malicious, intentional, reckless and unlawful and caused the death of decedent Carmelo Calderón-Molina.

88.    The murder of Carmelo Calderón-Molina was perpetrated by the JRA and its operatives, which received material support and resources from defendants.

89.    At the time of his death, decedent Carmelo Calderón-Molina left surviving plaintiffs Ruth Calderón-Cardona, Luz Calderón-Cardona, Luis Calderón-Cardona, Gloria Calderón-Cardona, José Raúl Calderón-Cardona, Ana Delia Calderón-Cardona, Hilda Calderón-Cardona, Salvador Calderón-Martínez, and his son, Miguel Calderón-Cardona, and his wife, Eladia Cardona-Rosario as his only heirs and survivors.

90.    Eladia Cardona-Rosario and Miguel Calderón-Cardona have died since the attack.

91.    At the time of his death, decedent Carmelo Calderón-Molina was 77 years of age and enjoying good health.  He was industrious and in possession of all his faculties.  As a result of the death of Carmelo Calderón-Molina, his Estate has suffered pecuniary loss, and has necessarily paid funeral expenses and various other expenses.

92.     By reason of the foregoing, the Estate of Carmelo Calderón-Molina has been damaged in an amount to be determined at trial.

93.     Defendants' conduct as described herein was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large.  The Estate of Carmelo Calderón-Molina is therefore entitled to an award of punitive damages in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**
**AS AGAINST ALL DEFENDANTS ON BEHALF OF**
**THE ESTATE OF CARMELO CALDERÓN-MOLINA**
**PAIN, SUFFERING AND SURVIVAL DAMAGES**

94.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

95.     As a result of the Terrorist Attack caused by defendants' actions described herein, prior to his death, decedent Carmelo Calderón-Molina sustained severe injuries to his body and suffered great pain, shock and physical and mental anguish.

96.     By reason of the above, decedent Carmelo Calderón-Molina and his Estate are entitled to damages in an amount to be determined at trial.

97.     Defendants' conduct as specified herein was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large.  The Estate of decedent Carmelo Calderón-Molina is therefore entitled to an award of punitive damages against defendants in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**AGAINST ALL DEFENDANTS ON BEHALF OF ALL PLAINTIFFS**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

98.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

99.    Defendants' conduct was willful, outrageous, egregious, and dangerous to human life, and violates applicable criminal law, all international standards of civilized human conduct and common decency.

100.    Defendants intended to and did in fact terrorize Eladia Cardona-Rosario and the plaintiffs and cause them severe emotional distress.

101.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large warranting an award of punitive damages.

## FIFTH CLAIM FOR RELIEF
## AGAINST ALL DEFENDANTS ON BEHALF OF ALL PLAINTIFFS
## LOSS OF CONSORTIUM AND SOLATIUM

102.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

103.    At all relevant times, Eladia Cardona-Rosario was the wife of Carmelo Calderón-Molina.

104.    As a result, and by reason of the death of Carmelo Calderón-Molina, which was caused by the actions of defendants described herein, Eladia Cardona-Rosario was deprived of the services, society and solatium of her husband, and suffered severe mental anguish, bereavement and grief, and injury to her feelings.

105.    At all relevant times, plaintiffs Ruth Calderón-Cardona, Luz Calderón-Cardona, Luis Calderón-Cardona, Gloria Calderón-Cardona, José Raúl Calderón-Cardona, Ana Delia Calderón-Cardona, Hilda Calderón-Cardona, Salvador Calderón-Martínez, and Miguel Calderón-Cardona were the children of Carmelo Calderón-Molina.

106.    As a result, and by reason of the death of Carmelo Calderón-Molina, which was

19

caused by the actions of defendants described herein, plaintiffs Ruth Calderón-Cardona, Luz Calderón-Cardona, Luis Calderón-Cardona, Gloria Calderón-Cardona, José Raúl Calderón-Cardona, Ana Delia Calderón-Cardona, Hilda Calderón-Cardona, Salvador Calderón-Martínez, and Miguel Calderón-Cardona have been deprived of the services, society and solatium of their deceased father, and have suffered severe mental anguish, bereavement and grief, and injury to their feelings.

107.    At all relevant times, plaintiff Antonia Ramirez-Fiero was the wife of plaintiff Pablo Tirado-Ayala.

108.    As a result, and by reason of the injuries sustained by Pablo Tirado-Ayala, which were caused by the actions of defendants described herein, plaintiff Antonia Ramirez-Fiero has been deprived of the services, society and consortium of her husband, and has suffered severe mental anguish, and injury to her feelings.

109.    Defendants' conduct as specified herein was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large.  Plaintiffs are therefore entitled to an award of punitive damages against defendants in an amount to be determined at trial.

**SIXTH CLAIM FOR RELIEF**
**AGAINST ALL DEFENDANTS**
**ON BEHALF OF PLAINTIFF ESTATE OF CARMELO CALDERÓN-MOLINA**
**AND PLAINTIFF PABLO TIRADO-AYALA**
**BATTERY**

110.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

111.    The Terrorist Attack constituted a battery on the person of Carmelo Calderón-Molina and Pablo Tirado-Ayala.

20

112.    The Terrorist Attack caused Carmelo Calderón-Molina and Pablo Tirado-Ayala physical and psychological injuries, extreme pain, suffering and severe financial loss, including deprivation of present and future income.

113.    The Terrorist Attack was carried out by the JRA and the PFLP acting with the material support, resources, and sponsorship of the defendants.  The Terrorist Attack was caused and facilitated by defendants' actions.

114.    Defendants' actions were willful, malicious, intentional, reckless, and unlawful and were the proximate cause of the Terrorist Attack and the battery on the person of Carmelo Calderón-Molina and Pablo Tirado-Ayala, and the injuries plaintiffs suffered therein.

115.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public warranting an award of punitive damages.

### SEVENTH CLAIM FOR RELIEF
### AGAINST ALL DEFENDANTS
### ON BEHALF OF PLAINTIFF ESTATE OF CARMELO CALDERÓN-MOLINA
### AND PLAINTIFF PABLO TIRADO-AYALA
### ASSAULT

116.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

117.    The Terrorist Attack and the ensuing carnage caused plaintiffs fear and apprehension of harm and death, and actual physical harm, and constituted assaults on Carmelo Calderón-Molina and Pablo Tirado-Ayala.

118.    The Terrorist Attack and assaults on their persons, which were direct and proximate results of defendants' actions, caused Carmelo Calderón-Molina and Pablo Tirado-Ayala extreme mental anguish and actual physical injury and pain and suffering.

119.    Defendants' conduct was outrageous in the extreme, wanton, willful and

malicious, and constitutes a threat to the public warranting an award of punitive damages.

**EIGHTH CLAIM FOR RELIEF**
**AS AGAINST ALL DEFENDANTS**
**ON BEHALF OF PLAINTIFFS**
<u>**CIVIL CONSPIRACY**</u>

120.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

121.    Defendants knowingly and willingly conspired, planned and agreed to sponsor and provide material support and resources for the commission of acts of extrajudicial killing by terrorist organizations, including the attack at the airport in which decedent Carmelo Calderón-Molina was killed and Pablo Tirado-Ayala was injured.

122.    As a result and by reason of the death of Carmelo Calderón-Molina and the injuries sustained by Pablo Tirado-Ayala, which were caused by defendants' conspiracy described herein, plaintiffs suffered the damages enumerated herein.  Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages.

**NINTH CLAIM FOR RELIEF**
**AS AGAINST ALL DEFENDANTS**
**ON BEHALF OF PLAINTIFFS**
<u>**AIDING AND ABETTING**</u>

123.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

124.    Defendants knowingly and willingly carried out tortious acts in concert with others pursuant to a common design, which resulted in extrajudicial killings by terrorist organizations, including the Terrorist Attack at the airport in which decedent Carmelo Calderón-Molina was killed and Pablo Tirado-Ayala was injured.

125.    As a result and by reason of the death of Carmelo Calderón-Molina and the

injuries sustained by Pablo Tirado-Ayala, which were caused by defendants' aiding and abetting described herein, plaintiffs suffered the damages enumerated herein.  Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

(a)     Enter judgment against defendants, jointly and severally, in favor of each plaintiff for compensatory damages in amounts to be determined at trial;

(b)     Enter judgment against defendants, jointly and severally, in favor of each plaintiff for punitive damages in amounts to be determined at trial;

(c)     Enter judgment against defendants in favor of each plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees; and

(d)     Grant such other and further relief as justice requires.


PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.


Dated: March ____, 2008
       San Juan, Puerto Rico


                                        LAW OFFICES OF MANUEL SAN JUAN


                                        S/Manuel San Juan
                          By     _____
                                        Manuel San Juan
                                        USDC-PR No.: 204706
                                        P.O. Box 9023587
                                        San Juan, Puerto Rico 00902-3587
                                        Telephone:     (787) 723-6637
                                        Facsimile:     (787) 725-2932

                                        Attorneys for Plaintiffs

OSEN LLC

Gary M. Osen *(pro hac vice application to be filed)*
Naomi B. Weinberg *(pro hac vice application to be filed)*
Aaron Schlanger *(pro hac vice application to be filed)*
700 Kinderkamack Road
Oradell, New Jersey 07649
Telephone:      (201) 265-6400
Facsimile:      (201) 265-0303

NITSANA DARSHAN-LEITNER & ASSOCIATES
Nitsana Darshan-Leitner, Esq.
11 Havatikim Street
Petah Tikva, 49389 Israel
Telephone:      (972) 03-7361519
Facsimile:      (972) 03-7361520