**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

RUTH CALDERON-CARDONA,
LUZ CALDERON-CARDONA,
LUIS CALDERON-CARDONA,
GLORIA CALDERON-CARDONA,
JOSE RAUL CALDERON-CARDONA,
ANA DELIA CALDERON-CARDONA,
HILDA CALDERON-CARDONA,
ANGEL CALDERON-GUZMAN,
MIGUEL CALDERON-GUZMAN,
SALVADOR CALDERON-MARTINEZ,
ANGEL LUIS RAMIREZ-COLON,
ANTONIA RAMIREZ-FIERO, *et al.*,

     **Plaintiffs,**

        **v.**

DEMOCRATIC PEOPLE'S REPUBLIC
OF KOREA, CABINET GENERAL
INTELLIGENCE BUREAU, JOHN DOE,

     **Defendants.**

**CIVIL NO.** 08-1367 (FAB)

**OPINION AND ORDER**

BESOSA, District Judge.

### Introduction

This is a civil action for wrongful death, personal injury and related torts pursuant to the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. § 1605A, arising from a terrorist machine-gun attack at Israel's Lod Airport[1] on May 30, 1972 (the "Lod Airport Attack").

---

[1] Today, Lod Airport is known as Ben-Gurion International Airport.

American citizen Carmelo Calderon-Molina ("Carmelo") was murdered in the Lod Airport Attack and American citizen Pablo Tirado-Ayala ("Pablo") was injured in the attack.[2]

The plaintiffs are the family members and estates of Carmelo and Pablo.[3]

Plaintiffs allege that the Lod Airport Attack was carried out as a joint operation by the Japanese Red Army ("JRA") and the Popular Front for the Liberation of Palestine ("PFLP") terrorist organizations, with the material support of the named defendants, the Democratic People's Republic of North Korea ("North Korea") and North Korea's Cabinet General Intelligence Bureau ("CGIB") ("defendants").[4]

Plaintiffs' Complaint was filed on March 27, 2008. (Docket No. 1)  As required by section 1608(a)-(b) of the FSIA, the Clerk initiated service of process on the defendants, which process included copies of the Complaint, summonses and a Notice of Suit,

---

[2] Pablo Tirado-Ayala passed away on December 29, 2009 for reasons unrelated to the attack.  On June 28, 2010 the Court substituted Angel Luis Ramirez-Colon as the Party of Interest in lieu of Pablo Tirado-Ayala, based upon the fact that he is the sole and universal heir of plaintiff Pablo Tirado-Ayala.  (Docket No. 35.)

[3] Additionally, the estates and heirs of various family members of Carmelo and Pablo who passed away in the years since the attack are also plaintiffs.

[4] The Complaint also names as defendants "John Does 1-10," but because these defendants have neither been identified nor served, they are dismissed from this action.

and Korean-language translations of those documents. (Docket No. 7)

Service was effected on North Korea and CGIB on July 21, 2008, pursuant to the provisions of FSIA section 1608(a)-(b). (Docket No. 8)

After the sixty-day period provided by section 1608 had passed without the defendants filing an answer or otherwise responding to this action, plaintiffs moved for entry of default against defendants pursuant to Rule 55(a). (Docket No. 8) On October 31, 2008, the Court entered default against defendants North Korea and CGIB. (Docket No. 9)

Notwithstanding defendants' default, the FSIA requires that a default *judgment* against a foreign state be entered only after a plaintiff "establishes his claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e).

Thus, pursuant to section 1608(e), this Court cannot enter default judgment in this case unless it finds that the plaintiffs have shown "by evidence that is satisfactory to the Court" that the Court has jurisdiction and that the defendants are liable. See e.g. Holland v. Islamic Republic of Iran, 496 F. Supp. 2d 1, 12 (D.D.C. 2005) ("Every case brought against a foreign state raises two distinct and crucial legal questions. First, the Court must look to whether it has jurisdiction to hear the claim. In the context of claims implicating the parameters of the FSIA, this

jurisdictional determination is guided by an inquiry into whether the case falls within one of the statutory exceptions to the sovereign immunity of a foreign state.  Second, the Court must consider the actual liability of the defendant foreign sovereign.") (citations omitted).

At the same time, pursuant to section 1608(e) "the Court may accept as true the plaintiffs' uncontroverted evidence."  Wachsman v. Islamic Republic of Iran, 603 F. Supp. 2d 148, 155 (D.D.C. 2009) (internal quotations omitted) (citing Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 100 (D.D.C. 2000)).  See also Botvin v. Islamic Republic of Iran, 604 F. Supp. 2d 22, 26 (D.D.C. 2009) (same); Gates v. Syrian Arab Republic, 580 F. Supp. 2d 53, 63 (D.D.C. 2008) (same); Alejandre v. Republic of Cuba, 996 F. Supp. 1239, 1243 (S.D. Fla. 1997) (same).

The "satisfactory to the court" standard contained in 28 U.S.C. § 1608(e) is identical to the standard for entry of default judgments against the United States government in Rule 55(e). Compañia Interamericana Export-Import, S.A. v. Compañia Dominicana de Aviacion, 88 F.3d 948, 951 (1996).

For the reasons set forth below, the Court finds that plaintiffs have clearly demonstrated both the Court's jurisdiction and the defendants' liability for their injuries "by evidence that is satisfactory to the Court."  28 U.S.C. § 1608(e).

## Findings of Fact

This Court conducted an evidentiary hearing on December 2, 2009 and December 3, 2009, at which plaintiffs presented evidence establishing, to section 1608(e)'s satisfaction, the following facts.

On May 30, 1972, American citizens Carmelo Calderon-Molina ("Carmelo") and Pablo Tirado-Ayala ("Pablo") arrived at Israel's Lod Airport near Tel Aviv, as part of a large group of Puerto Rican pilgrims touring Israel and visiting the Christian religious sites in the Holy Land.  For many of the participants on this church-organized trip, this was to be the experience of a lifetime, and one for which they had saved up money to finance for many years.

Three members of the JRA, disguised as regular passengers, who had just disembarked at Lod Airport on a flight arriving from Italy, recovered their luggage from the baggage carousel.  They then removed automatic weapons and grenades from their luggage and began shooting and throwing explosives indiscriminately into the crowd of innocent civilians which included Carmelo, Pablo and other passengers[5] located in the terminal building.

---

[5] Several other persons who were not passengers were also killed by the JRA terrorists.  Adam Tzamir, age 11, had accompanied his parents to greet an arriving relative, and was murdered while standing in the arrivals hall (Trial Transcript, Dec. 2, p. 25, ln. 18-22).

At the time of the Lod Airport Attack in 1972, there were no armed Israeli security personnel stationed inside Lod Airport,[6] and therefore the JRA terrorists encountered no organized resistance. At some point during the Lod Airport Attack, however, two of the terrorists were felled by self-inflicted wounds (one from a ricocheting bullet and the other by a prematurely-detonated grenade), at which time the third terrorist raced outside of the terminal building with the intention of blowing up several aircraft located on the tarmac.  (Exhibit No. 2, ¶ 24)

This third terrorist, Kozo Okamoto ("Kozo"), was eventually neutralized by Claude Chanan Zeitoun ("Zeitoun"), a Lod airport employee who, though unarmed, chased down Kozo near the runway, knocked away his automatic rifle, and restrained him until the police arrived.  (Exhibit No. 2, ¶¶ 12-18)

When the slaughter ceased, 26 innocent persons had been murdered and over 80 persons had been wounded by the JRA terrorists.  (Trial Transcript, Dec. 2, 2009, p. 27, ln. 18 and 23) Seventeen of the murdered victims were Puerto Rican pilgrims. Carmelo was killed in the Lod Airport Attack; his last act before

---

[6] According to Ze'ev Sarig, Managing Director of Ben-Gurion International Airport from 2004-2009, who was Assistant to the Deputy Director of Lod Airport at the time of the Lod Terrorist Attack (Trial Transcript, Dec. 2, pp. 11-12), an internal-airport terrorist attack had not been perpetrated prior to the Lod Airport Attack, and thus Lod Airport security had not anticipated that such an attack might originate from persons arriving on incoming flights to Lod.  (Trial Transcript, Dec. 2, 2009, pp. 21-22)

dying was to shield a pregnant woman with his body, absorbing bullets that otherwise would likely have killed her and her unborn child.[7]

Pablo was wounded in the Lod Airport Attack; for him and his family the attack became a watershed experience that negatively affected the quality of his life in significant ways, including severe psychological injuries which grievously disabled him and persisted for his entire life. (Trial Transcript, Dec. 3, 2009, p. 109, ln. 18-25)

During interrogations with Israeli authorities, Kozo admitted that his fellow attackers and he were members of the JRA and that the attack had been carried out in conjunction with the PFLP. The PFLP also publicly claimed responsibility for the attack; this claim was widely reported in the international press. Kozo was tried and convicted in an Israeli court for his involvement in the Lod Airport Attack. He received a life sentence.

Kozo was released from jail in 1985 as part of a prisoner release, and is believed to be living in Lebanon. (Trial Transcript, Dec. 2, 2009, p. 116, ln. 5 and p. 117, ln. 12)

---

[7] Gloria Calderon-Cardona, Carmelo's daughter, testified that she learned of her father's heroic last act when the grateful survivor came with her husband to the home of Eladia Cardona-Rosario (Carmelo's wife and Gloria's mother) to thank them for Carmelo's ultimate sacrifice. (Trial Transcript, Dec. 2, 2009, p. 163, ln. 9-14)

Carmelo's widow, Eladia Cardona-Rosario ("Eladia") and his ten children (eight with Eladia and two from a prior marriage) have suffered greatly from the loss of their loving spouse and father. Pablo and his family have suffered from his psychological injuries and chronic deep depression caused by the Lod Airport Attack and Pablo's consequent failure to be able to resume his prior, functioning lifestyle, including his inability to maintain employment.

The plaintiffs have established defendants' liability for the Lod Airport Attack primarily through the testimony of three expert witnesses:  Professor Barry Rubin ("Prof. Rubin"), Professor Bruce Bechtol ("Prof. Bechtol"), and Professor Rohan Gunaratna ("Prof. Gunaratna").

Two eyewitnesses to the Lod Airport Attack, Ze'ev Sarig and Claude Chanan Zeitoun, presented affidavit testimony (Exhibit Nos. 1 and 2); Mr. Sarig also testified before the Court at trial. (Trial Transcript, Dec. 2, 2009, pp. 9-34)  Each of the expert witnesses and two fact witnesses also submitted affidavit testimony as exhibits to plaintiffs' Pretrial Memorandum that was submitted prior to the trial.  (Docket No. 23)  (See also Exhibit Nos. 1, 2, 4, 6, and 8)

Professors Rubin, Bechtol, and Gunaratna offered documentary evidence, including government reports, publications, and other

information, in addition to their affidavit testimony and oral testimony at trial.

Although some of plaintiffs' evidence is cumulative, given the level of detail and insight the witnesses provided regarding the support by defendants to PFLP and JRA terrorism generally, and the Lod Airport Attack specifically, the Court will quote at length from their expert testimony.

**A.   Testimony of Professor Barry Rubin**

Plaintiffs presented affidavit and trial testimony by Prof. Rubin, the director and a member of the faculty of the Global Research in International Affairs Center (GLORIA) at the Interdisciplinary University (IDC), in Herzliya, Israel. Prof. Rubin is also a senior fellow at the IDC's International Policy Institute for Counter-Terrorism. He holds a doctorate degree from Georgetown University, a master's degree from Rutgers University, and a bachelor's degree from Richmond College. Prof. Rubin's affidavit and trial testimony were based upon his academic studies, research, teaching and publishing over the course of his many years as a director of IDC, a senior fellow at a counter-terrorism institute, and a lecturer at numerous academic institutions. During the course of his professional career and academic research, Prof. Rubin has obtained information from interviews with political leaders and captured terrorists, reviews of documents, periodicals, credible news reports, government

publications, and scholarly works, as well as from his own discussions with colleagues, observations and experiences living in the Middle East. (Exhibit Nos. 5 and 6)

Prof. Rubin, in his affidavit testimony, explained that at the time leading up to the Lod Airport Attack and thereafter, North Korea was a communist revolutionary regime whose goal was to help create additional communist states which would in turn provide North Korea with strategic and economic support. North Korea sought to accomplish these goals by fostering political unrest and instability in non-communist nations by supporting domestic groups that were striving to overthrow their governments violently. Accordingly, North Korea consistently demonstrated three qualities in particular which qualified it as an active state sponsor of terrorism: (i) its extremist militancy (as compared to other communist nations at that time such as the Soviet Union and People's Republic of China); (ii) its relative recklessness, as measured by its systematic willingness to shun international law and norms of behavior; and (iii) its desire to carve out an independent role for itself in promoting revolution and developing clients in the Middle East. (Exhibit No. 3, p. 6, ¶ 17) North Korea's main aspirations were to (a) help create additional communist states which would provide it with strategic and economic support, (b) discredit the United States (primarily by showing that the United States was ostensibly unable to protect its allies), and

(c) destroy countries friendly to the United States.  (Id. at ¶ 18)
The defendants determined that actively supporting terrorist groups
to act as their proxies was an effective means of achieving these
goals, and specifically that "Israel fell into that [the above]
category both as a direct target and as a symbolic target."  (Id.)

During the early 1970's, North Korea waged a battle against
its South Korean rival for diplomatic and trade relations with the
Arabic-speaking states.   The ability to strike against Israel
would, North Korean policymakers believed, greatly increase North
Korea's popularity and attractiveness as an ally within the Arab
world.  (Exhibit No. 3, p. 6, ¶ 19)  Prof. Rubin explained in his
affidavit testimony that North Korea was "willing to work with
those who no one else would work with, to provide weapons for those
who no one else would provide weapons for; and that not only
applied to countries, it even applied to terrorist groups." (Trial
Transcript, Dec. 2, 2009, p. 55, ln. 9-15)

One of North Korea's key interests at that time was to be a
global revolutionary player, and, as Prof. Rubin set forth in his
affidavit testimony, North Korea believed that goal would be
facilitated by North Korea establishing an effective terrorist
network.  As Prof. Rubin explained:

> "At the time of which we're speaking, the 1970's, was a
> high point in the history of international terrorism.  To
> be a revolutionary player, you had to have terrorist
> assets.  And North Korea was in a weak position because
> it was a smaller and weaker state than the Soviet Union
> and China.  So for them to get terrorist assets, they

could not go, so to speak, with the A-team, the first
league.  They had to find groups that others were not
willing to sponsor, and then use them to project North
Korean power by carrying out spectacular terrorist acts
which would show the world that North Korea was
important, was revolutionary, it was worth courting, and
also supported Arab causes, particularly in the
Palestinian cause.  So there was a perfect fit between
the three groups.  Each of them needed the others, and
each of them -- the alliance for each of them lacked
alternatives other than an alliance among the three
parties." (Trial Transcript, Dec. 2, 2009, ln. 2-18)

Given North Korea's ideology and aims, it is thus not
surprising that North Korea concluded that using terrorist groups
as proxies could effectively magnify its influence in the Middle
East.  As a practical matter, North Korea was well-positioned to
extend material support to terrorist groups; it carried with it the
benefits and the resources of a nation-state sponsor, including
financial assistance, military training, operational cover and safe
harbor.

It was not long before North Korea set up and operated
terrorist training camps (a large proportion of which were
Palestinian) in which over the years thousands of terrorists were
trained.  (Trial Transcript, Dec. 2, 2009, ln. 15)  These training
camps provided comprehensive instruction on weapons use,
bomb-making, kidnapping, assassination, propaganda, and guerrilla
warfare.  (Exhibit No. 6, ¶ 34)

North Korea also supplied Palestinian terrorist groups with a
wide variety of armaments.  The PFLP, a Palestinian terrorist
organization with a communist ideology, was an ideal match for the

North Korean regime, given that, as explained above, North Korea was already seeking to spread its own communist revolutionary aspirations via proxies throughout the Middle East.  In fact, North Korea was an important enough sponsor of the PFLP that, in September 1970, the notorious PFLP terrorist leader George Habash ("Habash") himself visited Pyongyang,[8] the capital of North Korea, personally to seek an increase in material support for his organization and to discuss possible collaboration with the JRA in future terror attacks.  (Trial Transcript, Dec. 2, 2009, p. 56, ln. 10 and Exhibit No. 6, ¶ 34)  Although the Palestine Liberation Organization's ("PLO") main branch, al-Fatah, received support from countries like China, the Soviet Union and Arab states, the PLO's poorer cousin, the PFLP, was forced to seek sponsorship from less prominent and wealthy "second- and third-tier" countries such as North Korea.

Habash's visit was much feted in the state-controlled North Korean media.[9]  (Exhibit No. 36, ¶ 6)  Prof. Rubin explained that this visit and North Korean media reports demonstrated North

---

[8] Habash was received "lavishly . . . as a hero, great leader, as an important figure."  (Trial Transcript, Dec. 2, 2009, p. 56, ln. 20)

[9] North Korean support for the Palestinian cause was also demonstrated in a telegram sent by Kim Il Sung to Yassir Arafat, chairman of the PLO (*The Pyongyang Times*, May 18, 1970): "The Korean people express full support to and firm solidarity with the just struggle of the Palestinian people who are valiantly fighting in arms to smash U.S. imperialism and the Israeli aggressors, its stooges, and to liberate their fatherland."  (Exhibit No. 6, ¶ 36)

Korea's increasing influence in promoting terrorist groups at this time, because the North Korea media was strictly controlled by its government and reflected its policies. As explained by Prof. Rubin, "[s]ince every action is an official action approved by the intelligence, military and the high leadership of North Korea, then we know that these are official actions." (Trial Transcript, Dec. 2, 2009, p. 65, ln. 7-10) It is especially telling that the North Koreans warmly welcomed Habash even though the PFLP already had been involved in attacks on Israeli targets, including the bombing a few months prior of a Swiss Air plane headed to Israel, killing 47 passengers. (Exhibit No. 3, ¶ 34) Moreover, during Habash's visit to North Korea, several PFLP operatives hijacked four western passenger planes, took three of the airliners to Jordan and blew them up. Prof. Rubin stated that "for Habash to leave the scene [i.e., the Middle East] at a time when they [his PFLP terrorists] were involved in the most important crisis in terrorist activity that they had ever been involved in is an indication of the importance of his [Habash's] going all the way to North Korea to pay a visit." (Trial Transcript, Dec. 2, 2009, p. 60, ln. 17-22)

During the Pyongyang visit, Habash met with the JRA leadership, including Kozo's brother Takashi Okamoto ("Takashi"). Takaski had, two years earlier, hijacked a Japanese airliner to North Korea. (Trial Transcript, Dec. 2, 2009, p. 61, ln. 11-20)

The visit between Habash and the fugitive JRA leaders hiding in
North Korea, who were secluded from the general population and
heavily guarded, could not have taken place without the direct
assistance and authorization of defendant CGIB.  Furthermore, Prof.
Rubin states that there were very close links between North Korea
and PFLP, and that North Korea actively courted PFLP, its
operatives even traveling to Lebanon to visit a major PFLP training
camp. (Trial Transcript, Dec. 2, 2009, p. 51, ln. 21-25)

     The JRA was founded as a radical communist group in 1969.  Its
first major operation was the March 1970 hijacking of a Japanese
airplane to North Korea, which was carried out by nine of its
members.[10]  (Exhibit No. 3, p. 11, ¶ 34)  Importantly, from its very
start, the JRA was largely dependent on North Korea to finance its
operations, training, general logistics (including use of North
Korea as a safe haven) and collaboration with other terrorist
groups.  (Exhibit No. 6, ¶ 37)  Prof. Rubin testified that "[i]t
would have been impossible for them [the JRA hijackers] to land it
[the hijacked Japanese airliner] or been there [in North Korea] for
one hour without North Korean government making an explicit
decision that this was in their interest and this is something they
wanted to promote that they would trust those people to act as
their agents." (Trial Transcript, Dec. 2, 2009, p. 58, ln. 25 – p.

_____

     [10] Additional information about defendants' especially good
treatment of these nine JRA terrorists will be referenced in the
testimony of Prof. Gunaratna, _infra_.

59, ln. 4)   Indeed, without the approval of the communist
leadership and the CGIB, which directed every aspect of government
policy, no actions in North Korea could be carried out.

The JRA numbered only roughly 40 members, and, in contrast to
most other terrorist groups, its survival was completely dependent
on continued North Korean sponsorship.   (Id.)   It had no other
important state sponsors of its terrorist activities.   Similarly,
one of the most important assets North Korea possessed was its link
to the JRA, over which it had exclusive patronage.[11]   (Exhibit
No. 6, ¶ 38)   Among the best things North Korea was able to offer
the PFLP was its intimate links to the JRA.   The JRA, in turn,

---

[11] There are several eyewitness accounts of North Korea-JRA
relations from JRA terrorists themselves.   Kozo recounted that he
was brought into the JRA by his brother, Takashi, who had been one
of those who had hijacked a Japanese passenger plane to North Korea
in March 1970.   Takashi, who was based in Pyongyang and was close
to North Korean intelligence, sent Kozo to Beirut for military
training with the PFLP in September 1971 for a seven-week course.
At the end of the course, Kozo was told he had been selected for
the Lod operation.   Aside from Kozo and his brother Takashi, two
other JRA terrorists illustrate a direct link between North Korea
and JRA.   Yoshimi Tanaka, a senior JRA member and another of the
March 1970 hijackers, was arrested eighteen years later in
Thailand.   At the time of his arrest, he was holding a North Korean
diplomatic passport and traveling with North Korean diplomats.
Clearly, he was functioning as a North Korean agent, among the
original group recruited at the same time as the future Lod
terrorists.   Another contact and source of information was the wife
of one of the 1970 hijackers who, after her arrest in March 2002,
testified that she had received orders from JRA leader Takamaro
Tamiya who, in turn, followed the commands of the North Korean
government.   Under this chain of command she helped kidnap a
Japanese student to North Korea, among other operations.   (Exhibit
No. 6, ¶¶ 40-43)

functioned as an effective intermediary through which Pyongyang's connections with the PFLP could be disguised.  (Id.)

Following the introduction of JRA terrorist leaders to Habash and other leaders of the PFLP, the two terrorist groups maintained contacts and even trained together in Beirut.  With the prospects so poor for starting a revolution in Japan, the JRA found the state of the Palestinian struggle far more advanced and an attractive means of providing the JRA with the opportunity for attaining a profile as a viable revolutionary group on the international stage. (Exhibit No. 6, ¶ 19)  The JRA could no longer function in Japan, however, because much of its leadership had either been arrested, killed, or had relocated to North Korea.  Thus North Korea played a vital role in the JRA's development; it was the location from which contacts with Japan were maintained and new cadre recruited. (Exhibit No. 6, ¶ 39)  North Korea and CGIB became the primary patrons of the JRA and greatly influenced its direction and policies.  In fact, at the time of the Lod Airport Attack, North Korea was the only state sponsoring the JRA.  (Trial Transcript, Dec. 2, 2009, p. 64, ln. 2)  And the JRA, in turn, was mindful of the sensitivities of its sponsor.  Prof. Rubin testified that the JRA deliberately did not want to select operatives who had resided at some time in North Korea to participate in the Lod Airport Attack because North Korea wished to have a certain level of deniability.  (Trial Transcript, Dec. 2, 2009, p. 68, ln. 6-14)

During his visit to North Korea in September 1970, Habash recruited JRA members to carry out attacks for the PFLP. (Exhibit No. 6, ¶ 44) Accompanied by North Korean officials, Habash visited the JRA hijackers, and himself requested that the JRA provide operatives to perpetuate the Lod Airport Attack. (Id.) Importantly, the Lod Airport Attack could not have been executed without the JRA, because PFLP operatives themselves, of Middle Eastern origin, would have been sure to arouse the suspicion and scrutiny of Israeli security.[12]  It was also vital for the operation that all PFLP-JRA contacts come about through North Korean channels, and were under its auspices.  While preparing for the attack, the JRA members were trained either in North Korea or, in the case of Kozo, were sent through earlier training with the PFLP arranged by North Korean intelligence assets.[13] (Exhibit No. 6, ¶ 46)

---

[12] This point was corroborated by Sarig in his trial testimony. He asserted that the PFLP knew that Japanese nationals would not be scrutinized by Israeli security in the same manner as Arabs traveling from Lebanon. (Exhibit No. 1, p. 32)  Rubin also further testified that Japanese operatives could "elude detection [by the Israelis] more easily."  (Trial Transcript, Dec. 2, 2009, p. 70, ln. 17-25)

[13] Several credible news sources, including *The New York Times*, reported several months after the attack that State Department Spokesman Charles W. Bray confirmed that North Korea had been supplying arms and other military assistance to PFLP prior to the Terrorist Attack.  According to evidence later presented to a Congressional Committee on May 14, 1975, at least some of the JRA terrorists who perpetrated the attack were actually trained in North Korea.

According to Prof. Rubin, the Lod Airport Attack constituted the consummation of a tripartite relationship between North Korea, the JRA, and the PFLP. (Exhibit No. 6, ¶ 53)  North Korea provided both terrorist groups with material support, resources, training, weapons, and refuge.  North Korea financed, armed and trained the groups that perpetrated the Lod Airport Attack, while providing sanctuary to the leadership of the JRA.  The seeds of the Lod Airport Attack were sown in 1970, when Habash visited North Korea and met with both the North Korean intelligence agencies and the JRA leadership.  (Exhibit No. 6, ¶ 44)  And from 1970-1972 defendants consistently harbored JRA terrorists, trained terrorists, provided terrorists with financial support, and otherwise provided material support to JRA and PFLP activities and operations (Exhibit No. 6, ¶ 54).  North Korea thus constituted the nexus of a relationship that resulted in the heinous murder and maiming of innocents at Lod Airport.  The Lod Airport Attack was the logical consequence of North Korean foreign policy and its aspirations to export communist ideology and revolution throughout the West, and was viewed by North Korea (as well as by the JRA and PFLP) as a model operation and an important victory.  (Exhibit No. 6, ¶ 53)

Prof. Rubin also testified at trial that the JRA and the PFLP could not have successfully perpetrated the Lod Airport Attack without North Korean support.  He stated at trial that "Any

terrorist attack depends on involvement of large groups of people. You need the recruitment, you need the training, you need the army, you need the provision of false documents which are credible, and . . . I think it's safe to say that the PFLP did not have the capability to produce such false documents.  That the only people who could have produced it for them were the North Koreans, who had a lot of experience in this area.  So there's a whole large cast of characters that stand behind an operation in which three people are firing guns." (Trial Transcript, Dec. 2, 2009, pp. 73-74)

Prof. Rubin further emphasized in his testimony that the Lod Airport Attack was "a very complex operation" in which terrorists had to infiltrate a "critically defended public facility in Israel, which is a country with strong defense and intelligence capabilities," and that North Korea's direct involvement was critical in enabling the JRA and PFLP to plan the Lod Airport Attack and for JRA terrorists to perpetrate the Lod Airport Attack. (Trial Transcript, Dec. 2, 2009, pp. 74-75)  Prof. Rubin explained:

> "So to do this, you have to create credible back stories;
> that is, cover stories for the people involved, you have
> to cover the tracks, you have to have them in places
> where foreign intelligence cannot penetrate, to using
> secure lines of communication that cannot be read.  The
> PFLP is not a country; it's not a government.   Its
> capabilities are limited.  So to - this is why terrorist
> groups need state sponsors.  Even in some cases, the most
> important of them, especially at that period of time when
> these things were more difficult, because if you're going
> to have a serious operation, there's simply a lot of
> things that a terrorist group cannot handle on its own.
> So that's why they - they need to find help from a
> government with unlimited money, with advanced printing

presses, with top quality communications that can't be
broken.  I mean, if the PFLP needs to send a telegram -
if they need to send a communication, they need to have
somebody help them because American codebreaking is very
good.  So how do you get around that? So this is why you
need a state sponsor."  (Trial Transcript, Dec. 2, 2009,
pp. 74-75)

In summary, the analysis reflected in Prof. Rubin's testimony
demonstrates to the Court's satisfaction that the JRA could not
have infiltrated Lod Airport nor otherwise perpetrated the Lod
Airport Attack without the material logistical, financial, training
and ideological support and resources provided by defendants.
North Korea used the JRA and the PFLP as proxies to do its bidding,
in that way allowing North Korea to avoid having to take
responsibility for the massacre.

**B.    Testimony of Professor Bruce Bechtol**

Plaintiffs presented both affidavit and trial testimony by
Bruce Bechtol, Professor of International Relations at the Marine
Corps Command and Staff College.  Prof. Bechtol also has served as
an Assistant Professor of National Security Studies at the Air
Command and Staff College, an adjunct Visiting Professor at the
Korea University Graduate School of International Studies and an
adjunct Professor of Diplomacy at Norwich University.  He received
a Ph.D. in National Security Studies from the Union Institute, a
master's degree in international affairs from the Catholic
University and a bachelor's degree from Excelsior College.
(Exhibit No. 3)

Prof. Bechtol has extensive experience in military affairs, having served on active duty for 20 years in the United States Marine Corps at various locations in the western Pacific and East Asia.  From 1997 until 2003, he was an Intelligence Officer at the Defense Intelligence Agency, and also served as the Senior Analyst for Northeast Asia in the Intelligence Directorate (J2) on the Joint Staff in the Pentagon.  Prof. Bechtol has been published in 19 peer review journals and also authored a comprehensive study of North Korea, *Red Rogue:  The Persistent Challenge of North Korea* (Potomac Books 2007), and has edited or been a contributing editor to several other books on North Korea. More recently, Prof. Bechtol authored another book about North Korea, whose publication is forthcoming, entitled *Defiant Failed State:  The North Korean Threat to International Security*.  (Exhibit No. 3)

Rather than reiterate many of the findings presented by Prof. Rubin set forth above, the Court will focus on trial and affidavit testimony presented by Prof. Bechtol which further highlights defendants' role in the attack.

Prof. Bechtol stated in his affidavit testimony that the JRA, almost from its inception, maintained client relationship with the CBIG.  (Exhibit No. 4, ¶ 17)  North Korean agents passed instructions to their JRA cadres and provided them with various material resources, including training and various weapons.  Some JRA members sought and were provided refuge in North Korea itself,

where they were supported by the North Korean government.  (Exhibit No. 4, ¶ 18)

Prof. Bechtol stated that Habash's official visit to North Korea in September 1970 constituted a watershed event in the tri-partite relationship between defendants, the PFLP and the JRA. He explained that the chain of evidence connecting the North Korean government to the PFLP (and ultimately the JRA as well) is further cemented by evidence that during his stay in North Korea, Habash was able to procure both weapons and funding from defendants. (Trial Transcript, Dec. 2, 2009, p. 95, ln. 3)

The reasons behind North Korea's interest in promoting a terrorist attack against Israel were described in Prof. Bechtol's affidavit testimony.  Prof. Bechtol outlined various reasons for North Korea's active support of state and non-state terrorists who, like North Korea, were hostile to the United States and its allies. As explained by Prof. Bechtol, North Korea has always regarded the United States as its primary enemy and its main threat to national survival.  (Exhibit No. 3, ¶ 19)  Israel is one of Washington's key allies and its most important democratic buffer in the Middle East. Thus, supporting terrorist groups from other nations targeting Israeli citizens and Jews was an important strategy employed by North Korea to keep Washington's focus on these terrorist groups and not on North Korea.  (Exhibit No. 3, ¶ 19)

As a matter of its official policy, North Korea provided material support, training, resources, weapons and safe haven to the JRA and PFLP during the period relevant to this case. Defendants ran roughly 30 terrorist training camps from 1968-1988 within North Korea's borders; those camps specialized in terrorist and guerilla warfare training.  These training camps serviced in excess of 10,000 terrorists, including members of the JRA and the PFLP, and provided various courses lasting anywhere from three to 18 months.[14]  (Exhibit No. 4, fn. 12) (Trial Transcript, Dec. 2, 2009, p. 88, ln. 9-14)  Defendants were also directly involved in training terrorists in other places around the world, including in the Beka'a Valley.  (Trial Transcript, Dec. 2, 2009, p. 88, ln. 9-17)  At the camps, North Korean military or intelligence service employees served as the principal trainers.  (Trial Transcript, Dec. 2, 2009, p. 90, ln. 5-17)

By supporting and financing these terrorist groups, North Korea advanced what it perceived as its foreign policy goals and carried out commitments it had to its own economic and political patrons such as the USSR and China.  The Lod Airport Attack was facilitated by the support, training and encouragement that North Korea provided to the PFLP and the JRA.

---

[14] Daryl M. Plunk, "North Korea:  Exporting Terrorism?" *Asian Studies Backgrounder* #74, Heritage Foundation, Feb. 25, 1988, www.heritage.org/research/asiaandthepacific/asb74.cfm. (Exhibit 4, fn. 12)

**C.    Testimony of Professor Rohan Gunaratna**

Plaintiffs also presented both affidavit and trial testimony by Dr. Rohan Gunaratna, Professor of Security Studies at the S. Rajaratnam School of International Studies and Director of the International Centre for Political Violence and Terrorism Research (ICPVTR) at the Nanyang Technological University, Singapore. Prof. Gunaratna has studied terrorist groups for over 25 years, focusing, in particular, on the phenomenon of Asian terror. He holds a doctorate in International Relations, University of St. Andrews in the United Kingdom (1996-1999), as well as a master's degree in International Peace Studies from the University of Notre Dame. (Exhibit No. 7)

Among other appointments, Prof. Gunaratna has been a member of the Advisory Board of the European Homeland Security Association since 2006 and a member of the Steering Committee, George Washington University, Homeland Security Policy Institute, since 2004. He is also the founder and member of the Board of Governors, Council for Asian Terrorism Research (CATR). (Exhibit No. 7)

Rather than reiterate many of the findings already presented by Profs. Rubin and Bechtol above, the Court will focus on trial and affidavit testimony presented by Prof. Gunaratna which further highlights defendants' role in the attack.

Prof. Gunaratna stated in his affidavit testimony that the JRA faction in North Korea was heavily controlled by the North Korean

government, and that in fact, JRA members acted as agents of that government.    (Exhibit No. 8, ¶ 26)    One of the methods that defendants used to control the JRA and other terrorist groups was consistently to provide them with a regular flow of material support and resources. In fact, when the nine members of the JRA hijacked the Japanese airplane to North Korea in 1970, the North Korean government "treated them [the JRA hijackers] like state guests." (Trial Transcript, Dec. 2, 2009, p. 118, ln. 18-23)  The North Korean government lavished the JRA terrorists with celebrity status,[15] and provided them with refuge in North Korea along with such luxuries as a Mercedes-Benz vehicle and servants to care for their needs.  (Trial Transcript, Dec. 2, 2009, p. 119, ln. 1-3) These nine JRA members later received ideological and military training from North Korea; many of them eventually officially became North Korean agents and engaged in operations directly on behalf of the North Korean government.  (Trial Transcript, Dec. 2, 2009, p. 119, ln. 4-9)

In his affidavit testimony, Prof. Gunaratna specifically cited the research of Joseph S. Bermudez, another expert on North Korean affairs, and (citing Mr. Bermudez) explained that defendants in the mid-1970s maintained six to ten training facilities in North Korean territory and numerous overseas training and advisory missions.

---

[15] These nine agents were known affectionately as the "Nine Samurai."  (Trial Transcript, Dec. 2, 2009, p. 118, ln. 25)

(Exhibit No. 8, ¶ 19)  Long-term training courses held in North
Korean facilities were located in the "vicinity of P'yongyang
(Wonhung-ri), Yongbyon, Sangwon, Haeju, Namp'o, and Wonsun" and
lasted between 12-24 months,[16] and North Korea also sponsored three
to six-month short-term training courses which were conducted
overseas.  (Id.)

     During the period between 1969 to 1974, the JRA and the PFLP
were among the various terrorist groups trained in those facilities
by defendants.  (Id.)  The training camps managed by North Korea
primarily taught guerilla warfare and "terroristing," or attacks on
civilian infrastructure and personnel.  (Trial Transcript, Dec. 2,
2009, p. 127, ln. 5-16)  As Prof. Gunaratna explained at trial,
". . . as part of the terrorist training, the North Korean
government agents imparted training in assassinations, in bombings,
in sabotage, in hijackings, in kidnappings, in hostage takings" so
that North Korea would have proxies skilled in perpetrating
terrorist acts to further its interests.[17]  (Id. at ln. 5-19) North
Korean instructors also traveled from North Korea to Lebanon to
provide training to JRA members in the terrorist camps located in

---

     [16] *Patterns of Global Terrorism*, U.S. State Department,
Washington, D.C., March 1989, p. 44 (Exhibit No. 8, fn. 18)

     [17] The instruction provided by defendants in those facilities
included advanced command and staff skills, communications,
intelligence gathering, marksmanship, map reading, ambush and
counter-ambush techniques, explosives, sabotage, propaganda and
psychological warfare, assassination, kidnapping and medical care.
(Exhibit No. 8, fn. 12 and 21)

the Beka'a Valley.  In addition to providing training, defendants provided JRA and PFLP members with weapons and financial and other assistance, including cover for operational matters.  (Id.)

Although North Korea generally attempted to conceal its sponsorship of the JRA and other terrorist groups, the evidence revealing such sponsorship is nevertheless well documented.  To quote the United States State Department's *Patterns of Global Terrorism*, "Japanese police believe that Yasuhiro Shibata, a JRA member arrested in Tokyo in May, was 'run' by North Korean intelligence agents." (Exhibit No. 8, ¶ 20)  Shibata was using the identity of a former North Korean resident of Japan who had immigrated to North Korea in 1972. (Id.)  Japanese authorities did arrest a number of JRA members who traveled from North Korea to other countries and then re-entered Japan.  Based on debriefings, the seizure of documents and intelligence of the Japanese police, North Korea actively provided forged, adapted and fraudulently obtained genuine identification and other Japanese government-issued documents to JRA members.  (Trial Transcript, Dec. 2, 2009, p. 128, ln. 17-25)  North Korea had expertise in adapting photo substitution and name changes for such documents, and was able to produce high-quality forgeries.  (Trial Transcript, Dec. 2, 2009, p. 129, ln. 8-19)

There were other significant benefits flowing to the JRA in having North Korea as a state sponsor of its terrorist activities.

Because North Korea is a state, it has "natural cover and capacity to operate."  (Trial Transcript, Dec. 2, 2009, p. 124, ln. 8-9) For example, Prof. Gunaratna testified that there was a JRA member who was operating in Thailand with the CGIB, regarding whom he stated "[t]hey [CGIB] were bringing in counterfeit U.S. dollars from North Korea, and they were putting that money back to the U.S. dollar system in Thailand.  And the Japanese Red Army member was traveling inside a North Korean diplomatic vehicle, so the Japanese Red Army used the diplomatic pouches, the diplomatic immunities, and the diplomatic privileges of North Korea."  (Trial Transcript, Dec. 2, 2009, p. 124, ln. 5-19)

The history of the JRA, as traced from its creation until its demise, clearly demonstrates that North Korea's state sponsorship was crucial for the JRA's survival.  Indeed, a desire for a patron state is common to all terrorist organizations.  The United States State Department noted in an official publication that "[w]ithout state sponsors, terrorist groups would have much more difficulty obtaining the funds, weapons, materials, and secure areas they require to plan and conduct operations."[18]  (Exhibit No. 8, ¶ 37) As such, North Korean state sponsorship of both the JRA and PFLP

---

[18] *State Sponsors of Terrorism Overview, Country Reports on Terrorism*, Office of the Coordinator for Counter Terrorism, Department of State, Washington, D.C., April 30, 2007

enabled both these terrorist groups to forge a partnership and facilitated their perpetration of terror attacks worldwide.[19]

Prof. Gunaratna also testified at trial that North Korean direct and indirect sponsorship of the JRA and its provisions of material support was paramount for the JRA's survival, sustenance and operation globally. (Exhibit No. 8, ¶ 38) North Korea not only sponsored the JRA directly, but also sponsored the JRA's operational partner PFLP as well. (Id.) Thus, all of the terrorist operations carried out by the JRA alone, and jointly with PFLP, during the period of North Korean sponsorship, including the Lod Airport Attack, are attributable to North Korea's leadership and intelligence services. (Id.) In fact, North Korean leader Kim Il-Sung envisioned using the JRA as North Korea's proxy well into the future - to keep the revolution continuing beyond the first generation. To this end, Kim Il-Sung instructed the JRA members living in North Korea to take Japanese wives so that their Japanese children could form the next generation of JRA fighters. (Trial Transcript, Dec. 2, 2009, p. 134, ln. 17-19) The CGIB even worked with the JRA to lure Japanese women living in Europe to North Korea for the purpose of having these children, and its efforts were successful to a certain extent; roughly 17 of those children have

_____

[19] Eric Pace, "Lebanon is said to have set up Liaison Unit with Commandos" *The New York Times*, September 23, 1972 and Peter Grose, "Terrorists:  Four Minutes of Horror at the Airport," June 4, 1972.

in fact returned to live in Japan, presumably to continue the struggle. (Trial Transcript, Dec. 2, 2009, p. 134, ln. 13-25)

Prof. Gunaratna highlighted another important issue at trial – namely that the JRA selection of Lod Airport as a target reflected the JRA's primary goal of shocking people with extreme violence and high-impact attacks, what could be referred to as "spectacular or theatrical attacks." (Trial Transcript, Dec. 2, 2009, p. 113, ln. 11-25) The JRA firmly believed that theatrical attacks would most effectively spread its ideology, and facilitate its continuing recruitment efforts. In fact, the audaciousness of the Lod Airport Attack can only be truly understood in the context of 1972; until the attack on Lod Airport in the contemporary wave of terrorism, there had never been a "suicide" or "no-surrender" terrorist attack.[20] (Trial Transcript, Dec. 2, 2009, p. 115, ln. 18-25 - p. 116, ln. 1-2)

Further, Prof. Gunaratna's testimony highlighted a direct link between North Korea and the Lod Airport Attack. One of the "Nine Samurai" (see fn. 17 supra) was "Takashi", Kozo's brother. Takashi asked Kozo (who at that time was living in Japan) to travel to Lebanon to work with JRA members training there. Takashi's message to Kozo was sent to Japan from North Korea after Habash's visit to North Korea. In referring to this exchange, Prof. Gunaratna

_____

[20] Thus, according to Prof. Gunaratna's trial testimony, the world can thank North Korea and its proxy, the JRA, for the innovation of suicide terrorist attacks.

testified, "[t]his is very significant.  It's a direct link."
(Trial Transcript, Dec. 2, 2009, p. 130, ln. 3-9)

## D.   Documentary Evidence

In addition to providing detailed and thorough expert
testimony about the defendants and their provision of material
support and resources to the PFLP and the JRA, the plaintiffs
submitted additional documentary evidence to provide further
background and context concerning the Lod Airport Attack, as
Exhibits 65 through 76 to their Proposed Findings of Fact and
Conclusions of Law:

> Exhibit No. 66:  United States Department of State, *Terrorist Attack at Lod Airport*, May 30 1972.

> Exhibit No. 67:  Peter Grose, "Four Minutes of Horror at the Airport," *The New York Times* (June 4, 1972).

> Exhibit No. 68:  Moshe Brilliant, "Witnesses Reconstruct Account of a Three-Minute Nightmare," *The New York Times* (June 1, 1972)

> Exhibit No. 69:  Sen. Jud. Comm. Subcomm. *To Investigate the Administration of the Internal Security Act and other Internal Security Law, Terroristic Activity—International Terrorism*, 94th Cong. (May 14, 1975); p. 183.

> Exhibit No. 70:  United States Library of Congress, *Country Profile: North Korea*, Ch. 4, Sec. "The Media," available at http://lcweb2.loc.gov/frd/cs/kptoc.html.

> Exhibit No. 71:  *The Pyongyang Times*, "Speech by Comrade Kim Il Sung at the Airfield," (Oct. 6, 1969).

> Exhibit No. 72:  Eric Pace, "Lebanon is Said to Have Set Up Liaison Unit With Commandos," *The New York Times* (Sept. 23, 1972).

Exhibit No. 73:   *The Pyongyang Times*, "Militant Solidarity with Palestinian People's Struggle," (May 20, 1972).

Exhibit No. 74: Joseph S. Bermudez, Jr., *Terrorism: The North Korean Connection* (New York, N.Y. Taylor & Francis New York Inc. 1990) p. 102.  (Previously referenced in Exhibit 8, fn. 12)

Exhibit No. 75:  Yoshihiro Kuriyama, *Terrorism at Tel Aviv Airport and a 'New Left' Group in Japan, Asian Survey*, Vol. 13, No. 3 (Mar. 1973)

Exhibit No. 76:   53 Fed. Reg. 3477-01 (Feb. 5, 1988), 1988 WL 276528.  (Previously referenced in Plaintiffs' Pretrial Memorandum, fn. 4)

Exhibit No. 77: United States Dept. of State, *Patterns of Global Terrorism: 1988*. (Previously referenced in Exhibit No. 8, fn. 18)

## Conclusions of Law

The FSIA was enacted in 1976 and is the sole basis of jurisdiction over foreign states in the federal courts.  See Argentine Republic v. Amerada Hess Shipping, 488 U.S. 428, 434 (1989).  The FSIA codifies the "restrictive theory" of sovereign immunity under which foreign states are generally immune from the jurisdiction of courts of the United States subject to specific exceptions.  See Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 488-89 (1983).

As originally enacted, the exceptions to immunity under the FSIA included cases in which a foreign state had waived its immunity and those involving commercial activities of a foreign

state with a nexus to United States.  See Verlinden, 461 U.S. at 488 (discussing main exceptions to immunity under the FSIA).

In April 1996, however, Congress enacted a "terrorism exception" to immunity under the FSIA as part of the Antiterrorism and Effective Death Penalty Act of 1996.  Pub. L. No. 104-132, § 221(a)(1)(C), 110 Stat. 1214, 1241.  That exception, which was codified at 28 U.S.C. § 1605(a)(7), lifted the sovereign immunity of designated foreign state sponsors of terrorism in civil actions brought by American citizens for terrorist attacks carried out by those foreign states or for which the foreign states had provided material support and resources.

Later in 1996, Congress amended the FSIA (the "Flatow Amendment") to create a cause of action for terrorism against officials, employees and agents of those foreign states.  See Pub. L. 104-208, § 589, 110 (1996), 110 Stat. 3009-1, 3009-172 (codified at 28 U.S.C. § 1605 note).

Federal courts initially construed section 1605(a)(7) and the Flatow Amendment, read in tandem, as creating a federal cause of action against the foreign state itself.  See e.g. Flatow v. Islamic Republic of Iran, 999 F. Supp. 1 (D.D.C. 1998).  The Court of Appeals for the District of Columbia Circuit ultimately held, however, that neither section 1605(a)(7) nor the Flatow Amendment created a cause of action against the foreign state itself.  See

Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024 (D.C. Cir. 2004).

Following *Cicippio-Puleo*, the federal courts began to apply non-federal tort remedies (usually under the law of the state in which the plaintiff or decedent was domiciled) to determine the liability of foreign states sued under section 1605(a)(7). This methodology resulted in judgments in which plaintiffs injured by the same terrorist attack received vastly different awards – including cases where some plaintiffs-victims were denied recovery entirely while others were awarded significant damages. See e.g. Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25 (D.D.C. 2007) (ordering that damage awards to family members of United States servicemen killed in 1983 attack on the United States Marine Corps barracks in Beirut be granted or denied on the basis of the widely disparate rules of recovery obtaining in each plaintiff's respective state of domicile).

In order to remedy this problem (and other difficulties faced by section 1605(a)(7) plaintiffs), in 2008 Congress enacted section 1083 of the National Defense Authorization Act for Fiscal Year 2008, H.R. 4986. P.L. 110-181, January 28, 2008 ("NDAA").

Section 1083 of the NDAA replaced section 1605(a)(7) of the FSIA with a new provision, section 1605A. Section 1605A(c) creates a new federal cause of action for American citizens injured in

terrorist attacks sponsored by designated foreign state sponsors of terrorism.  28 U.S.C. § 1605A(c).

Thus, "§ 1605A(c) abrogates *Cicippio-Puleo* . . . by creating a federal right of action against foreign states, for which punitive damages may be awarded."  Simon v. Iraq, 529 F.3d 1187, 1190 (D.C. Cir. 2008), *rev'd on other grounds*, 129 S.Ct. 2183 (2009).

Indeed, section 1605A is "more advantageous to plaintiffs in several respects."  Id.  For example, section 1083 of the NDAA amends section 1610 of the FSIA, which governs enforcement of judgments against foreign states.  Section 1083 adds a new subsection, section 1610(g)(1), which significantly eases enforcement of judgments entered under section 1605A.  See 28 U.S.C. § 1610(g)(1).

Moreover, the NDAA includes provisions allowing plaintiffs to refile pending section 1605(a)(7) cases under section 1605A (provided certain conditions are met) and to be able to benefit from all the advantages of a section 1605A action.  Section 1083(c)(3) provides in relevant part:

> Related actions – If an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28, United States Code . . . any other action arising out of the same act or incident may be brought under section 1605A of title 28, United States Code, if the action is commenced not later than . . . 60 days after . . . the date of the enactment of this Act.

28 U.S.C. § 1083(c)(3).  See, generally, In re Islamic Republic of
Iran Terrorism Litigation, 659 F. Supp. 2d 31 (D.D.C. 2009)
(discussing NDAA's refiling provisions).

     The plaintiffs in this action originally brought suit against
the defendants under section 1605(a)(7) in the United States
District Court for the District of Columbia.  Calderon-Cardona v.
Democratic People's Republic of Korea, Civil No. 06-744 (RBW)
(D.D.C.) ("D.C. Action").

     Section 1605A was enacted during the pendency of the D.C.
Action.  Accordingly, in order to obtain the advantages provided by
Congress under section 1605A, the plaintiffs dismissed the D.C.
Action without prejudice (id. at Docket No. 14) and exercised their
right under section 1083(c)(3) of the NDAA[21] to file this action in
this district under section 1605A.

     Section 1605A eliminates foreign sovereign immunity in cases
"in which money damages are sought against a foreign state for
personal injury or death that was caused by an act of . . .

_____

     [21] Plaintiffs clearly met the two conditions required by
section 1083(c)(3) – that the original section 1605(a)(7) action
was "timely commenced" and that the section 1605A action be
commenced no later than 60 days after the enactment of the NDAA.
Pursuant to section 1605(f), actions pursuant to section 1605(a)(7)
were timely if filed within ten years after the date of the
enactment of section 1605(a)(7).  Simon, 529 F.3d at 1194-1196.
Section 1605(a)(7) was enacted on April 24, 1996, and the
plaintiffs' D.C. Action was filed on April 24, 2006
(Calderon-Cardona, Civ. No. 06-744 at Docket No. 1) and thus was
timely.  This action was filed on March 27, 2008, which is less
than 60 days after the enactment of the NDAA on January 28, 2008.

extrajudicial killing . . . or the provision of material support or

resources for such an act if such act or provision of material

support or resources is engaged in by an official, employee, or

agent of such foreign state while acting within the scope of his or

her office, employment, or agency."  28 U.S.C. § 1605A(a)(1).

Here, plaintiffs have met the conditions set forth in

section 1605A:

First, this case is an action for money damages.

Second, the Lod Airport Attack was clearly an act of

extrajudicial killing within the meaning of section 1605A.[22]  The

attack was an act of extrajudicial killing within the meaning of

section 1605(A)(a)(1) because Carmelo and 27 other innocent persons

were killed.  Congress specifically permitted actions for "personal

injury . . . that was caused by an <u>act</u> of . . . extrajudicial

killing" 28 U.S.C. § 1605A(a)(1) (emphasis added).  Thus, section

1605A(a)(1) does not require that the injury to a plaintiff result

from the actual "extrajudicial killing," but rather from an "act of

extrajudicial killing."  A deadly terrorist attack, taken as a

whole, clearly constitutes an "act" of extrajudicial killing.  <u>See</u>

_____

[22] Section 1605A(h)(7) adopts the definition of extrajudicial
killing contained in 28 U.S.C. § 1350 note, i.e. "a deliberated
killing not authorized by a previous judgment pronounced by a
regularly constituted court affording all the judicial guarantees
which are recognized as indispensable by civilized peoples.  Such
term, however, does not include any such killing that, under
international law, is lawfully carried out under the authority of
a foreign nation."

Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 270 (D.D.C. 2003) (finding that plaintiffs injured in suicide bombing were entitled to bring an action under section 1605(a)(7) because other persons were killed in the bombing).

Third, at trial, plaintiffs clearly demonstrated that, through their officials, employees and agents, who were acting pursuant to defendants' official policies and therefore within the scope of their office, employment and agency, the defendants provided material support and resources to the JRA, PFLP and their operatives, within the meaning section 1605A, for the specific purpose of carrying out acts of extrajudicial killing such as the Lod Airport Attack.

Fourth, section 1605A(a)(2)(A)(i)(II) further provides that a claim under section 1605A shall be heard when the "action [is] filed under this section [1605A] by reason of section 1083(c)(3) of" the NDAA and the defendant "was designated as a state sponsor of terrorism when the original action . . . under section 1605(a)(7) . . . was filed."  28 U.S.C. § 1605A(a)(2)(A)(i)(II).

As discussed supra, plaintiffs filed this action pursuant to section 1083(c)(3) of the NDAA as related to their original D.C. Action.  When the D.C. Action was filed, North Korea had already

been officially designated as a state sponsor of terrorism.[23] Thus,

the condition that the foreign state defendant "was designated as

a state sponsor of terrorism when the original action . . . under

section 1605(a)(7) . . . was filed" is satisfied here.

Finally, section 1605A(a)(2)(A)(ii)(I) requires that "the

claimant or the victim was, at the time the act . . . occurred . .

. a national of the United States."

Plaintiffs have provided evidence that both they and the

victims (i.e. Carmelo and Pablo) were United States citizens at the

time of the Lod Airport Attack.[24]

Accordingly, the conditions of section 1605A have been met,

and the Court concludes that defendants are not immune from this

action.

Because defendants are not immune from this action and service

of process has been effected, this Court possesses both

subject-matter and personal jurisdiction.  See 28 U.S.C. § 1330(a)

(Providing that the "district courts shall have original

jurisdiction without regard to amount in controversy of any nonjury

---

[23] North Korea was designated as a state sponsor of terrorism
in 1988.  (Exhibit 8, ¶ 39) See Notice, Determination Pursuant to
Section 6(j) of the Export Administration Act of 1979; North Korea,
53 Fed. Reg. 3477 (Feb. 5, 1988).  North Korea's designation was
rescinded on October 11, 2008.  Id.  See Notice, Rescission of
Determination Regarding North Korea, 73 Fed. Reg. 63540 (Oct. 24,
2008).

[24] See Exhibits 30, 31, 32, 33, 34, 35, 36, 37, 38 and
Exhibit A to Exhibit 46 and Exhibit A to Exhibit 47.

civil action against a foreign state . . . with respect to which the foreign state is not entitled to immunity . . . under sections 1605-1607 of this title"); Texas Trading & Milling Corp. v. Federal Republic of Nigeria, 647 F.2d 300, 308 (2d Cir. 1981) (Under the FSIA "subject matter jurisdiction plus service of process equals personal jurisdiction.").

**Findings Regarding Liability**

Section 1605A(c) of the FSIA expressly creates a federal statutory cause of action for plaintiffs in an action brought under section 1605A.

Because the elements of a claim under section 1605A(c) must also be established in order to waive the foreign state's immunity and vest the court with subject-matter jurisdiction under section 1605A, liability under section 1605A(c) will exist whenever the jurisdictional requirements of section 1605A are met. See Kilburn v. Islamic Republic of Iran, --- F. Supp. 2d ----, 2010 WL 1198561 at *19 (D.D.C. 2010) ("[T]he § 1605A(c) cause of action is fulfilled by demonstrating that the foreign sovereign performed acts described in subsection (a)(1) of § 1605A, which addresses immunity and subject matter jurisdiction.  . . . Although an analysis of a foreign sovereign's potential immunity and liability should be conducted separately, the elements of immunity and liability under § 1605A(c) are essentially the same in that § 1605A(a)(1) must be fulfilled to demonstrate that a plaintiff has

a cause of action."). <u>See also</u> <u>Gates v. Syrian Arab Republic</u>, 580

F. Supp. 2d 53 (D.D.C. 2008) (same).[25]

Accordingly, because, as discussed <u>supra</u>, defendants' immunity

is waived under section 1605A due to their provision of material

support and resources to the JRA and the PFLP, defendants are

liable to plaintiffs under section 1605A(c).

### Compensatory Damages

In actions brought under section 1605A, plaintiffs are

entitled to "economic damages, solatium, pain, and suffering, and

punitive damages." § 1605A(c).

On the matter of damages, the Court received live and

affidavit[26] testimony from each of the plaintiffs. Also, plaintiffs

---

[25] The fact that liability arises once sponsorship of terrorist
activities is demonstrated for jurisdictional purposes is not
surprising because "[s]ponsorship of terrorist activities
inherently involves a conspiracy to commit terrorist attacks.  As
a co-conspirator, both with its own agents, officials and
employees, and with others, such as the terrorist organization and
the ultimate perpetrators, the foreign state is also a joint
tortfeasor." <u>Flatow</u>, <u>supra</u> at 27.

[26] Indeed, a plaintiff may establish his or her proof in FSIA
default judgment proceedings via affidavit, and live testimony is
not required. <u>See e.g.</u> <u>Weinstein v. Islamic Republic of Iran</u>, 175
F. Supp. 2d 13, 17 (D.D.C. 2001); <u>Campuzano v. Islamic Republic of
Iran</u>, 281 F. Supp. 2d 258, 268 (D.D.C. 2003); <u>Oveissi v. Islamic
Republic of Iran</u>, 498 F. Supp. 2d 268, 272 (D.D.C. 2007); <u>Bennett
v. Islamic Republic of Iran</u>, 507 F. Supp. 2d 117, 125 (D.D.C. 2007;
<u>Weinstein v. Islamic Republic of Iran</u>, 184 F. Supp. 2d 13, 19
(D.D.C. 2002); <u>Hutira v. Islamic Republic of Iran</u>, 211 F. Supp. 2d
115 (D.D.C. 2002); <u>Elahi v. Islamic Republic of Iran</u>, 124 F.
Supp. 2d 97, 100 (D.D.C. 2000); <u>Int'l Road Fed'n v. Democratic
Republic of the Congo</u>, 131 F. Supp. 2d 248, 252 (D.D.C. 2001);
<u>Commercial Bank of Kuwait v. Rafidain Bank</u>, 15 F.3d 238, 242 (2d
Cir. 1994).

presented expert medical testimony in the form of affidavits and reports from of Alexandra Ramos-Duchateau, Ph.D, a clinical and forensic psychologist.

Quantifying the multiple layers of harm which plaintiffs suffer is difficult.  As guidance for determining the quantum of damages, the Court is aided by the dozens of civil terrorism decisions under the FSIA.  In determining the appropriate amount of compensatory damages, the Court may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium.  Haim v. Islamic Republic of Iran, 425 F. Supp. 2d 56, 71 (D.D.C. 2006) (Lamberth, J.).  "While intervening changes in law have ruled many cases' reliance on federal common law improper, such findings need not disturb the accuracy of the analogy between solatium and intentional infliction of emotional distress."  Id.

> This Court has previously set out a general framework for compensatory awards for family members of victims who were killed as a result of terrorist activity consisting of $8 million to spouses of deceased victims, $5 million to parents and children of deceased victims, and $2.5 million to siblings of deceased victims.

Acosta v. The Islamic Republic of Iran, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).

There is also clear guidance from prior FSIA cases on awards to victims, like Pablo, who were injured in terrorist attacks. Surviving victims of terrorist attacks are generally awarded between $7 and $15 million for their own pain and suffering.

Campuzano, 281 F. Supp. 2d 258 (D.D.C. 2003) (awards ranging from $7 to $15 million to victims for past and future pain and suffering, loss of prospective income, and past medical expenses), Blais v. Islamic Republic of Iran, 459 F. Supp. 2d 40 (D.D.C. 2006) ($20 million for pain and suffering and mental anguish), Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25 (D.D.C. 2007) (26 injured survivors of the 1983 Beirut attack were awarded between $1.5 million and $12 million for battery).

Courts have also made significant awards to plaintiffs who endured the trauma and emotional impact of having a relative injured in a terrorist attack. Kirschenbaum v. Islamic Republic of Iran, 572 F. Supp. 2d 200 (D.D.C. 2008) ($2.5 million to each parent of injured United States citizen; parents suffered great emotional anxiety after hearing of the attack, endured the sight of their son with multiple open wounds, watched him suffer, and thereafter had to deal with the strain on their relationship with their son); Blais v. Islamic Republic of Iran, 459 F. Supp. 2d 40 (D.D.C. 2006) ($3.5 million for pain and suffering to each parent of United States serviceman severely injured in Saudi terrorist bombing); Campuzano, 281 F. Supp. 2d 258 ($2.5 million to mother for loss of solatium and severe mental anguish from the physical and emotional changes to daughter); Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25 (D.D.C. 2007) ($2.5 million for pain and

suffering to parents of United States servicemen injured in 1983 Beirut bombing).

Since the Lod Airport Attack was committed, members of Carmelo's family have suffered ongoing anguish and suffering by reason of Carmelo's murder, and their concomitant loss of Carmelo's society, guidance and company.  Plaintiffs' pain and suffering is obviously enormous, has been with them constantly since the day of the Lod Airport Attack and they will continue to experience the effects of the tragedy for the remainder of their lives.  Likewise, Pablo and his family also experienced, and his heirs and estate will continue to experience, severe harm as the result of the Lod Airport Attack.

**A.   Ruth Calderon-Cardona (individually)**

Ruth Calderon-Cardona ("Ruth") is a citizen of the United States (Exhibit No. 36) and resides in Puerto Rico.  (Trial Transcript, Dec. 3, 2009, pp. 6-7)  From the time of her father's death, Ruth has experienced emotional pain and suffering, loss of her father's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

Ruth testified that her childhood was filled with happy memories of her father, Carmelo.  She said that he was a "very good husband and father" and a member of the church choir (Trial Transcript, Dec. 3, 2009, p. 11, ln. 9), and above all a "family

man." (Trial Transcript, Dec. 3, 2009, p. 30, ln. 21) At night Carmelo would sit with Ruth and her siblings on the porch and he would teach them various songs and poems, and recite them repeatedly with patience until they were memorized (Trial Transcript, Dec. 3, 2009, p. 10, ln. 16-19, and 24-25).

Ruth remembers fondly that Carmelo would take her smaller siblings on his lap and would tell them all stories, sing songs, and recite poems, all of which she and her siblings still remember fondly. (Trial Transcript, Dec. 3, 2009, p. 30, ln. 14-16)

Ruth testified that her family would drive almost every week into the country to visit extended family, from both her father's and mother's sides of the family. The whole family would take these trips together. (Trial Transcript, Dec. 3, 2009, p. 14, ln. 6-10) Carmelo had a close relationship with his wife's immediate and extended family, and several cousins even lived for a time in Carmelo and Eladia's home. (Trial Transcript, Dec. 3, 2009, p. 14, ln. 19-25)

Ruth stated that it was "his [Carmelo's] dream" to visit the Holy Land, and that he was "very enthusiastic" about the trip. (Trial Transcript, Dec. 3, 2009, p. 19, ln. 9-16) She last spoke with her father when he surprised her with a call from the airport in New York while en route to Israel; she remembers that this made her "very happy." (Trial Transcript, Dec. 3, 2009, p. 20, ln. 10-13) Due to the Lod Airport Attack, this, unfortunately, was

to be the last time that Ruth spoke with her father. (Trial Transcript, Dec. 3, 2009, p. 21, ln. 1)

Ruth was at work when she received a call from her brother-in-law in Puerto Rico, and learned of the terrible news that her father had been brutally murdered. She fainted. (Trial Transcript, Dec. 3, 2009, p. 22, ln. 24) Soon thereafter, Ruth met her sister Luz (who had flown in from California) at the airport in New York, and they continued together to Puerto Rico. She described Luz as being "devastated." (Trial Transcript, Dec. 3, 2009, p. 24, ln. 10) Once in Puerto Rico, the week-long wait for her father's body to return for burial was "just terrible" (Trial Transcript, Dec. 3, 2009, p. 25, ln. 25) and "devastating." (Trial Transcript, Dec. 3, 2009, p. 26, ln. 11) Her mother, Eladia was heavily sedated during this time. (Trial Transcript, Dec. 3, 2009, p. 24, ln. 25) as well as for quite some time thereafter.

Ruth testified that since the time of Carmelo's burial, for the last 37 years, she and her siblings have taken turns to visit his grave regularly. Someone makes the trip roughly every two months to clean Carmelo's grave of plants and to otherwise pay their respects. (Trial Transcript, Dec. 3, 2009, p. 30, ln. 2-12) Ruth stated that the death of her father has affected her and her siblings "tremendously." (Trial Transcript, Dec. 3, 2009, p. 30, ln. 22)

As an American citizen, Ruth has a direct cause of action under section 1605A.  She has suffered in many ways from the Lod Airport Attack.  Her family life has been permanently disrupted and her childhood and past relationship with her mother and siblings has been marred.  Ruth is therefore entitled to the following award for each of the following claims set forth in plaintiffs' Complaint:

1.   first claim for relief (for damages under 28 U.S.C. § 1605A(c)); namely, that defendants provided material support and resources which caused and facilitated the Lod Airport Attack;

2.   fourth claim for relief; namely, that defendants' behavior (a) was intended to and did in fact terrorize Ruth and cause her severe emotional distress, and (b) was willful, outrageous, egregious, and dangerous to human life, and violated applicable criminal law, all international standards of civilized human conduct and common decency, and (c) was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, warranting an award of punitive damages;

3.   fifth claim for relief; namely, (a) that the murder of Carmelo by the JRA caused Ruth to be deprived of the services, society and solatium of her deceased father, and to suffer severe mental anguish, bereavement and grief, and injury to her feelings, and (b) that defendants' conduct as specified here was outrageous in the extreme, wanton, willful and malicious, and constituted a

threat to the public at large, and therefore Ruth is entitled to an award of punitive damages against defendants;

4. eighth claim for relief; namely, that defendants knowingly and willingly conspired, planned and agreed to sponsor and provide material support and resources for the commission of acts of extrajudicial killing by terrorist organizations, including the attack at the airport in which Carmelo was killed, and as a result and by reason of the death of Carmelo, which was caused by defendants' conspiracy described here, Ruth suffered the damages enumerated here; and

5. ninth claim for relief; namely, that defendants knowingly and willingly carried out tortious acts in concert with others pursuant to a common design, which resulted in extrajudicial killings by terrorist organizations, including the Lod Airport Attack at the airport in which Carmelo was killed and, as a result and by reason of the death of Carmelo, which was caused by defendants' aiding and abetting described here, Ruth suffered the damages enumerated here.

The analysis detailed above regarding awards to direct terror victims and relatives of victims applies to Ruth. Like the rest of her family, Ruth has been harmed on many levels by the Lod Airport Attack. She lost a loving and devoted father, witnessed her mother become permanently depressed and disabled, suffers the trauma of the JRA's murder of her father, and endures the daily

disruption to her family life and her relationship with her parents and siblings. Accordingly, Ruth is awarded $5,000,000 as compensatory damages. Defendants are jointly and severally liable for the full amount of Ruth's compensatory damages.

**B.   Luz Calderon-Cardona**

Luz Calderon-Cardona ("Luz") is a citizen of the United States (Exhibit No. 37) and resides in Puerto Rico. (Trial Transcript, Dec. 3, 2009, p. 65, ln. 20-24) From the time of her father's death, Luz has experienced emotional pain and suffering, loss of her father's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

Luz testified that she has extremely fond memories of her childhood, especially time spent with her father, Carmelo. She stated that Carmelo would buy her and her siblings bats and gloves and teach them to play baseball (Trial Transcript, Dec. 3, 2009, p. 56, ln. 8-10). Carmelo would also often play board games and cards with his children, dominos, checkers and "brisca" (a Spanish card game), and would joke with Eladia when she played along, prompting one of her sisters to playfully ask "Hey Dad, why are you winking at Mom?" (Trial Transcript, Dec. 3, 2009, p. 56, ln. 12-23).

Whenever a new baby was born to the family, Carmelo would lovingly take the older children (Luz, Ruth, Luis and Gloria) aside

right after the new baby was born - family babies were always born
at home with a midwife rather than in the hospital - and put the
newborn into each of their arms and say "This is your new sister or
brother.  You have to love [her/]him very much and take care of
[her/]him."  (Trial Transcript, Dec. 3, 2009, p. 55, ln. 1-15).

Luz testified that Carmelo's life's dream was to travel to the
Holy Land.  She said, "He [Carmelo] would always tell us that
before he died he wanted to see the land that Jesus walked.  And he
never got an opportunity to see it because that [the Lod Airport
Attack] happened at the airport [Lod Airport]."  (Trial Transcript,
Dec. 3, 2009, p. 58, ln. 21-25)

When Luz learned of her father's murder, she "couldn't believe
it," because she had recently seen her father and he was "the
healthiest my father had been.  He even had gained some weight.  He
even looked younger."  (Trial Transcript, Dec. 3, 2009, p. 60,
ln. 2-5)

When asked at trial how she felt after looking at photographs
of the massacre at trial, she commented "it affected me because I
didn't want to see those scenes again.  I -- just that I always
wanted to remember him [Carmelo] like he was when he was with us."
(Trial Transcript, Dec. 3, 2009, p. 65, ln. 20-24)

As an American citizen, Luz has a direct cause of action under
section 1605A.  She has suffered in many ways from the attack.  Her
family life has been permanently disrupted and her childhood and

past relationship with her mother and siblings has been marred. Luz is therefore entitled to the following award for each of the following claims set forth in plaintiffs' Complaint:

1.    first claim for relief (for damages under 28 U.S.C. § 1605A(c)); namely, that defendants provided material support and resources which caused and facilitated the Lod Airport Attack;

2.    fourth claim for relief; namely, that defendants' behavior (a) was intended to and did in fact terrorize Luz and cause her severe emotional distress, and (b) was willful, outrageous, egregious, and dangerous to human life, and violated applicable criminal law, all international standards of civilized human conduct and common decency, and (c) was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, warranting an award of punitive damages;

3.    fifth claim for relief; namely, (a) that the murder of Carmelo by the JRA caused Luz to be deprived of the services, society and solatium of her deceased father, and to suffer severe mental anguish, bereavement and grief, and injury to her feelings, and (b) that defendants' conduct as specified here was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, and therefore Luz is entitled to an award of punitive damages against defendants;

4.    eighth claim for relief; namely, that defendants knowingly and willingly conspired, planned and agreed to sponsor

and provide material support and resources for the commission of acts of extrajudicial killing by terrorist organizations, including the attack at the airport in which Carmelo was killed, and as a result and by reason of the death of Carmelo, which was caused by defendants' conspiracy described here, Luz suffered the damages enumerated here; and

5.   ninth claim for relief; namely, that defendants knowingly and willingly carried out tortious acts in concert with others pursuant to a common design, which resulted in extrajudicial killings by terrorist organizations, including the Lod Airport Attack at the airport in which Carmelo was killed and, as a result and by reason of the death of Carmelo, which was caused by defendants' aiding and abetting described here, Luz suffered the damages enumerated here.

The analysis detailed above regarding awards to direct terror victims and relatives of victims is applicable to Luz.  Like the rest of her family, Luz has been harmed on many levels by the Lod Airport Attack.  She lost a loving and devoted father, witnessed her mother become permanently depressed and disabled, suffers the trauma of the JRA's murder of her father, and endures the daily disruption to her family life and her relationship with her parents and siblings.  Accordingly, Luz is awarded $5,000,000 as compensatory damages.  Defendants are jointly and severally liable for the full amount of Luz's compensatory damages.

## C.   Luis Calderon-Cardona

Luis Calderon-Cardona ("Luis") is a citizen of the United States (Exhibit No. 34) and resides in Puerto Rico.  From the time of his father's death, Luis has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

Luis was not able to testify in court, because he suffers from various medical complications after being injured in a car accident several years ago, including impairment to both his short-term and long-term memory.  (Trial Transcript, Dec. 2, 2009, p. 142, ln. 14-18)  He did, however, issue a written declaration which was made on November 21, 2007.  (Exhibit No. 26)

Luz testified at trial that Luis' car accident, which resulted in his debilitating injuries, occurred several years after the Lod Airport Attack, and that Luis was in the hospital recovering for a long period of time and suffered significant memory loss.  Luis started asking for Carmelo (who had been murdered years before) and Eladia would tell Luis' siblings not to tell him anything about his father's death.  Once Luis was discharged from the hospital, however, it became increasingly difficult to hide the truth, and upon doctor's orders the family once again had to break the news of Carmelo's death to Luis.  (Trial Transcript, Dec. 3, 2009, pp. 62-64)  Luz stated that Luis "became just uncontrollable" with

grief upon learning of his father's murder, and lamented that Luis, all of the siblings and their mother had to suffer the raw pain of Carmelo's murder once again.  (Trial Transcript, Dec. 3, 2009, pp. 63-64) (<u>See also</u> Declaration submitted by Ruth Calderon-Cardona, Exhibit No. 27, at ¶¶ 26-38; Declaration of Gloria Calderon-Cardona, Exhibit No. 23, ¶¶ 25-38; Declaration of Luz Calderon-Cardona, Exhibit No. 28, ¶¶ 21-26).

In Luis' written declaration he stated that "I loved my father dearly.  We shared many times together.  One of my favorite memories is of when he and I used to sing in the church choir together each week.  Being in the choir meant a lot to me, but sharing this activity with my father each week made it even more meaningful and special."  (Exhibit No. 26, ¶ 5)  Luis also reflected with gratitude on the fact that Carmelo built a house for him and his first wife, a very special gift.  (Exhibit No. 26, ¶ 7)

Regarding Carmelo's death, Luis said that "I know that my father was killed by terrorists years ago.  Knowing this makes the loss of my father even more painful.  Thinking of my father dying a violent death fills me with deep sadness."  (Exhibit No. 26, ¶ 4)

Luis concluded his written declaration by stating, "I know I will never fully understand how and why my father was murdered by the terrorists.  That, too, adds to the distress I feel.  Whether in the church choir or other instances, I will never get back the years we would have had together.  I feel robbed of my father's

love and companionship which is incredibly unfair.  Those chances
to share our lives were cut short when he was killed.  My loss is
for a lifetime."  (Exhibit No. 26, ¶ 9)

As an American citizen, Luis has a direct cause of action
under section 1605A.  He has suffered in many ways from the attack.
His family life has been permanently disrupted and his childhood
and past relationship with his parents and siblings has been
marred.  And furthermore, due to his injuries resulting from a
serious car accident (which affected his memory), Luis had to
suffer the excruciating emotional pain of dealing with the loss of
his father for a second time.  Luis is therefore entitled to the
following award for each of the following claims enumerated in
plaintiffs' Complaint:

1.  first claim for relief (for damages under 28 U.S.C.
§ 1605A(c)); namely, that defendants provided material support and
resources which caused and facilitated the Lod Airport Attack;

2.  fourth claim for relief; namely, that defendants'
behavior (a) was intended to and did in fact terrorize Luis and
cause him severe emotional distress, and (b) was willful,
outrageous, egregious, and dangerous to human life, and violated
applicable criminal law, all international standards of civilized
human conduct and common decency, and (c) was outrageous in the
extreme, wanton, willful and malicious, and constituted a threat to
the public at large, warranting an award of punitive damages;

3.   fifth claim for relief; namely, (a) that the murder of Carmelo by the JRA caused Luis to be deprived of the services, society and solatium of his deceased father, and to suffer severe mental anguish, bereavement and grief, and injury to his feelings, and (b) that defendants' conduct as specified here was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, and therefore Luis is entitled to an award of punitive damages against defendants;

4.   eighth claim for relief; namely, that defendants knowingly and willingly conspired, planned and agreed to sponsor and provide material support and resources for the commission of acts of extrajudicial killing by terrorist organizations, including the attack at the airport in which Carmelo was killed, and as a result and by reason of the death of Carmelo, which was caused by defendants' conspiracy described here, Luis suffered the damages enumerated here; and

5.   ninth claim for relief; namely, that defendants knowingly and willingly carried out tortious acts in concert with others pursuant to a common design, which resulted in extrajudicial killings by terrorist organizations, including the Lod Airport Attack at the airport in which Carmelo was killed and, as a result and by reason of the death of Carmelo, which was caused by defendants' aiding and abetting described here, Luis suffered the damages enumerated here.

The analysis detailed above regarding awards to direct
terror victims and relatives of victims is applicable to Luis.
Like the rest of his family, Luis has been harmed on many levels by
the Lod Airport Attack.  He lost a loving and devoted father,
witnessed his mother become permanently depressed and disabled,
suffers the trauma of the JRA's murder of his father, and endures
the daily disruption to his family life and his relationship with
his parents and siblings.  Accordingly, Luis is awarded $5,000,000
as compensatory damages.  Defendants are jointly and severally
liable for the full amount of Luis' compensatory damages.

## D.   Gloria Calderon-Cardona

Gloria Calderon-Cardona ("Gloria") is a citizen of the United
States (Exhibit No. 31) and resides in Puerto Rico.  From the time
of her father's death, Gloria has experienced emotional pain and
suffering, loss of her father's society, companionship, comfort,
advice and counsel and has suffered severe mental anguish and
extreme emotional distress.

Gloria testified at trial that as a child she considered
Carmelo to be "a loving father.  He was an upright, upstanding man,
but he was a loving father, and . . . whenever we had to go on a
trip, if we all didn't go, he wouldn't go."  (Trial Transcript,
Dec. 2, 2009, p. 148, ln. 6-11)  Asked about Carmelo's relationship
with his wife Eladia, Gloria said, "they had a loving relationship.
It was a very close relationship at all times."  (Trial Transcript,

Dec. 2, 2009, p. 146, ln. 19-20)  Gloria added that her father, "was a Christian, and . . . he taught us that we had to go every Sunday to church."  (Trial Transcript, Dec. 2, 2009, p. 146, ln. 5-6)

Gloria described the regular weekend family trips to the countryside:  "Whenever we traveled -- because we went out to the countryside a lot -- and we would always go together as a family. My father had a cargo truck that he would use for construction, where he would take his materials; so on Sunday for church, he would put some benches in the back, and we would sit on those benches and all sit in the back of the truck.  So a -- when we would go out to the countryside, if we brought in fruits, we brought in banana, plantains, when we would get home, then he would tell us to give it -- to give out fruits to the neighbors.  The neighbors were first."  (Trial Transcript, Dec. 2, 2009, p. 149, ln. 10-19)

Gloria said that because her father "was always at home" playing with the children, he would teach them "about the constellations, the Major, the Minor, and also teach us about poetry, songs, games."  (Trial Transcript, Dec. 2, 2009, p. 147, ln. 14-19)  She continued, "Well, at night, he would buy corn, corn on the cob, and my mom would roast them.  And then we would all get in the living room, and he taught us the game of odds and even." (Trial Transcript, Dec. 2, 2009, p. 147, ln. 23-25)

At Christmas, the family was all together.  Gloria said, "My father would always kill a pig, my mother would prepare it for Christmas dinner, and we would have "pasteles," "arroz con dulce," "blood sausage," because all that used to be prepared at home.  And at night we would all sit down at the table -- and sometimes we did have family from the countryside that would come in and join us." (Trial Transcript, Dec. 2, 2009, p. 148, ln. 16-21)

New Year's Day is also a very vivid memory for Gloria.  "New Year's Day we would spend it -- we'd all spend it together.  We would receive the New Year, all of us together, with our neighbors, singing, and we would -- that would also be true for Christmas Eve. We would always get on the porch with the "maracas," the "palitos," with all types of instruments.  There would be singing, together with neighbors, that would also come to our home."  Trial Transcript, Dec. 2, 2009, p. 149, ln. 1-7)

Gloria testified that Carmelo had "always dreamed about some day going to the Holy Land, to go to the places where Jesus had walked there and had preached." (Trial Transcript, Dec. 2, 2009, p. 154, ln. 24-25; p. 155, ln.1)  She explained that a neighboring church group that aspired to visit the Holy Land came to Carmelo's church and wanted to form a larger group to make the trip.  Once Carmelo saw that his dream could become a reality, he decided to join the group and was very excited.  (Trial Transcript, Dec. 2, 2009, p. 155, ln. 2-16)

Carmelo very much wanted for Eladia to accompany him to the Holy Land.  They had always traveled on vacation together – to see children (sisters Luz and Ruth) who were living in New York or otherwise – and Carmelo would never travel without her.  But at that time Carmelo was planning the trip to Israel, Eladia's blood pressure was too high, and her doctor advised her that it would be better for her to stay at home.  (Trial Transcript, Dec. 2, 2009, p. 155, ln 18-24)

On the day of the trip, Gloria and Eladia accompanied Carmelo to the airport to say goodbye, and Gloria described Carmelo and his fellow tour group members as "euphoric."  (Trial Transcript, Dec. 2, 2009, p. 156, ln 2-7)

Early the next morning, Gloria was awakened by a call from a woman from their church, who indicated that there had been a massacre at Lod Airport.  Gloria immediately turned on the radio and started listening to the news, which announced that a Carmen Calderon had been murdered in the attack.  Because Gloria had a cousin named Carmelo Calderon, she assumed that this cousin had flown with the group to Israel and had unfortunately been killed.  As she continued to listen to the news, however, she suddenly realized that the radio announcer had changed the name on the victims list from "Carmen Calderon" to "Carmelo Calderon."  (Trial Transcript, Dec. 2, 2009, pp. 156 and 157)  Overcome with shock and

grief, Gloria fell to her knees and asked God to help her.  (Trial Transcript, Dec. 2, 2009, p. 157, ln. 15-17)

Gloria said at trial:  "I really don't remember what I did . . . All I know is that well, when I calmed down, I -- I thought of my younger brother Miguel, who was a police officer, and I thought that maybe he -- he -- since he was a police officer, he was going to be stronger, and he could help me give my mother the news. Since he lived upstairs, I called him, and he came down; but when I told him the news, well, he -- well, he couldn't anymore." (Trial Transcript, Dec. 2, 2009, p. 157, ln. 15-25, p. 158, ln. 1-2)

Gloria then faced the excruciating task of breaking the news of her father's murder to her mother.  She remembered, "I gave her the news . . . and she began to talk and talk, that I thought that she had gone crazy."  (Trial Transcript, Dec. 2, 2009, p. 158, ln. 4-8)

The family and neighbors all gathered at the house of Carmelo and Eladia; the only updates they received about what had happened to their father was from the news.  (Trial Transcript, Dec. 2, 2009, p. 158, ln. 11-19)

It took roughly seven days for Carmelo's body to be returned to Puerto Rico, and Gloria stated that she felt "desperate" during this time.  She added "But the Lord gives you strength."  (Trial Transcript, Dec. 2, 2009, p. 158, ln. 4-8)

Gloria testified that when she saw her father's body at the wake, "The only thing I could do, was to touch him." (Trial Transcript, Dec. 2, 2009, p. 158, ln. 4-8)

Gloria said that the loss of her father dramatically affected the entire family, especially her mother. For a long time the family didn't do the things it had always done, like go out to the countryside together. (Trial Transcript, Dec. 2, 2009, pp. 161-162)

When asked at trial what she thought of when she viewed pictures of her father in court, Gloria replied "The day that my father died." (Trial Transcript, Dec. 2, 2009, p. 163, ln. 19) When asked how she felt, Gloria simply replied "destroyed." (Trial Transcript, Dec. 2, 2009, p. 163, ln. 21)

As an American citizen, Gloria has a direct cause of action under section 1605A. She has suffered in many ways from the attack. Her family life has been permanently disrupted and her childhood and past relationship with her parents and siblings has been marred. Gloria is therefore entitled to the following award for each of the following claims enumerated in plaintiffs' Complaint:

1. first claim for relief (for damages under 28 U.S.C. § 1605A(c)); namely, that defendants provided material support and resources which caused and facilitated the Lod Airport Attack;

2. fourth claim for relief; namely, that defendants'
behavior (a) was intended to and did in fact terrorize Gloria and
cause her severe emotional distress, (b) was willful, outrageous,
egregious, and dangerous to human life, and violated applicable
criminal law, all international standards of civilized human
conduct and common decency, and (c) was outrageous in the extreme,
wanton, willful and malicious, and constituted a threat to the
public at large, warranting an award of punitive damages;

3. fifth claim for relief; namely, (a) that the murder of
Carmelo by the JRA caused Gloria to be deprived of the services,
society and solatium of her deceased father, and to suffer severe
mental anguish, bereavement and grief, and injury to her feelings,
and (b) that defendants' conduct as specified here was outrageous
in the extreme, wanton, willful and malicious, and constituted a
threat to the public at large, and therefore Gloria is entitled to
an award of punitive damages against defendants;

4. eighth claim for relief; namely, that defendants
knowingly and willingly conspired, planned and agreed to sponsor
and provide material support and resources for the commission of
acts of extrajudicial killing by terrorist organizations, including
the attack at the airport in which Carmelo was killed, and as a
result and by reason of the death of Carmelo, which was caused by
defendants' conspiracy described here, Gloria suffered the damages
enumerated here; and

5.    ninth claim for relief; namely, that defendants knowingly and willingly carried out tortious acts in concert with others pursuant to a common design, which resulted in extrajudicial killings by terrorist organizations, including the Lod Airport Attack at the airport in which Carmelo was killed and, as a result and by reason of the death of Carmelo, which was caused by defendants' aiding and abetting described here, Gloria suffered the damages enumerated here.

The analysis detailed above regarding awards to direct terror victims and relatives of victims is applicable to Gloria. Like the rest of her family, Gloria has been harmed on many levels by the Lod Airport Attack.  She lost a loving and devoted father, witnessed her mother become permanently depressed and disabled, suffers the trauma of the JRA's murder of her father, and endures the daily disruption to her family life and her relationship with her parents and siblings.  Accordingly, Gloria is awarded $5,000,000 as compensatory damages.  Defendants are jointly and severally liable for the full amount of Gloria's compensatory damages.

**E.    Jose Raul Calderon-Cardona**

Jose Calderon-Cardona ("Jose") is a citizen of the United States (Exhibit No. 33) and resides in Puerto Rico.  From the time of his father's death, Jose experienced emotional pain and suffering, loss of his father's society, companionship, comfort,

advice and counsel and has suffered severe mental anguish and extreme emotional distress.

Jose testified at trial that Carmelo was "a very loving father" with whom he had a "very good" relationship. (Trial Transcript, Dec. 3, 2009, p. 69, ln. 13, 21) Jose stated that Carmelo would spend time with him and his siblings teaching them about his profession, and they would sometimes go to work with him. (Trial Transcript, Dec. 3, 2009, p. 69, ln. 13-16)

Once Jose was married, he would even see his parents every Saturday, when the entire family would converge on their childhood home. The family would also all get together on every holiday. (Trial Transcript, Dec. 3, 2009, p. 70, ln. 4-10)

Jose testified at trial that when he heard that his father had been murdered, he felt as if his "world [had] ended" (Trial Transcript, Dec. 3, 2009, p. 71, ln. 23) and went straight to his parents' house to see his mother. (Trial Transcript, Dec. 3, 2009, p. 72, ln. 6) He wore dark glasses at Carmelo's funeral because he didn't want anybody to see that he was crying. (Trial Transcript, Dec. 3, 2009, p. 73, ln. 1-5)

Jose said that the first Christmas after his father was murdered was a very sad occasion, and that "[i]t wasn't the same. We were missing the cornerstone of our family [Carmelo]." (Trial Transcript, Dec. 3, 2009, pp. 73-74) Jose said that he thinks of his father in particular on the anniversary of his murder and on

all of the holidays when the family used to converge on their parents' home. (Trial Transcript, Dec. 3, 2009, p. 74, ln. 17-20) Jose said that he feels "very sorry" that his child never had a chance to meet his grandfather, Carmelo. (Trial Transcript, Dec. 3, 2009, p. 74, ln. 24-25)

When asked about how he felt when viewing pictures of the Lod Airport Attack during the trial, Jose testified "I felt immense pain within me because I was thinking of what was – what went through his mind? What was happening? If he saw the bullets? If he died quickly? If it took him time to die? You know." (Trial Transcript, Dec. 3, 2009, p. 75, ln. 2-9)

As an American citizen, Jose has a direct cause of action under section 1605A. He has suffered in many ways from the attack. His family life has been permanently disrupted and his childhood and past relationship with his parents and siblings has been marred. Jose is therefore entitled to the following award for the following claims enumerated in plaintiffs' Complaint:

1. first claim for relief (for damages under 28 U.S.C. § 1605A(c)); namely, that defendants provided material support and resources which caused and facilitated the Lod Airport Attack;

2. fourth claim for relief; namely, that defendants' behavior (a) was intended to and did in fact terrorize Jose and cause him severe emotional distress, (b) was willful, outrageous, egregious, and dangerous to human life, and violated applicable

criminal law, all international standards of civilized human conduct and common decency, and (c) was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, warranting an award of punitive damages;

3. fifth claim for relief; namely, (a) that the murder of Carmelo by the JRA caused Jose to be deprived of the services, society and solatium of his deceased father, and to suffer severe mental anguish, bereavement and grief, and injury to his feelings, and (b) that defendants' conduct as specified here was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, and therefore Jose is entitled to an award of punitive damages against defendants;

4. eighth claim for relief; namely, that defendants knowingly and willingly conspired, planned and agreed to sponsor and provide material support and resources for the commission of acts of extrajudicial killing by terrorist organizations, including the attack at the airport in which Carmelo was killed, and as a result and by reason of the death of Carmelo, which was caused by defendants' conspiracy described here, Jose suffered the damages enumerated here; and

5. ninth claim for relief; namely, that defendants knowingly and willingly carried out tortious acts in concert with others pursuant to a common design, which resulted in extrajudicial killings by terrorist organizations, including the Lod Airport

Attack at the airport in which Carmelo was killed and, as a result and by reason of the death of Carmelo, which was caused by defendants' aiding and abetting described here, Jose suffered the damages enumerated here.

The analysis detailed above regarding awards to direct terror victims and relatives of victims is applicable to Jose as well.  Like the rest of his family, Jose has been harmed on many levels by the Lod Airport Attack.  He lost a loving and devoted father, witnessed his mother become permanently depressed and disabled, suffers the trauma of the JRA's murder of his father, and endures the daily disruption to his family life and his relationship with his parents and siblings.  Accordingly, Jose is awarded $5,000,000 as compensatory damages.  Defendants are jointly and severally liable for the full amount of Jose's compensatory damages.

**F.   Ana Delia Calderon-Cardona**

Ana Calderon-Cardona ("Ana") is a citizen of the United States (Exhibit No. 30) and resides in Puerto Rico.  From the time of her father's death, Ana has experienced emotional pain and suffering, loss of her father's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

Ana testified at trial that growing up in Carmelo's home was "very good" (Trial Transcript, Dec. 3, 2009, p. 33, ln. 21.)  She

remembers fondly how Carmelo would sit with her and her siblings on the porch and teach them poems, sing theme songs (mainly hymns) and tell all kinds of stories, stories about when he was a boy. (Trial Transcript, Dec. 3, 2009, p. 34, ln. 6-16)  She referred to Carmelo as "the best [father] in the world" because "he was a friend, he was an advisor, he was a good father, a good provider, he would take care of his children." (Trial Transcript, Dec. 3, 2009, pp. 34-35)  Ana also stated that Carmelo would spoil them: "Well, he [Carmelo] would buy us everything - well, he would give our mother money for her to buy us things.  If he saw something that he liked, he would bring it to the children, the younger children, and always take us out." (Trial Transcript, Dec. 3, 2009, p. 35, ln. 4-7)

Upon learning of her father's murder, Ana immediately went to her mother's home.  She felt like she was "walking on air." (Trial Transcript, Dec. 3, 2009, p. 39, ln. 7)  When she broke the news of her Carmelo's murder to her fifteen year old son, he replied that he wanted to go where [the terrorists] were and "pay them back." (Trial Transcript, Dec. 3, 2009, p. 39, ln. 11-16)

Ana stated that after Carmelo's death her mother, Eladia, "was almost always under sedation because she had a heart condition and her blood pressure shot up during those days, so the doctor was almost always going to see her, if not every day." (Trial Transcript, Dec. 3, 2009, p. 40, ln. 6-9).  When Ana saw her

father's body at his funeral, all she was able to do was "cry, cry, and cry and cry." (Trial Transcript, Dec. 3, 2009, p. 40, ln. 21)

Ana does not feel, 37 years after Carmelo's murder, that she has been able to overcome his loss. As she testified, "[i]t's too strong a pain . . . But [it's] strong. It's always strong." (Trial Transcript, Dec. 3, 2009, p. 41, ln. 19-22)

When asked at trial whether there was anything more she wanted to tell the Court about her loss, Ana said, "May God forgive the ones who did this. And -- Well, and I wouldn't want anybody, anybody in the world to suffer or to go through what we went -- what his daughters had to go through." (Trial Transcript, Dec. 3, 2009, p. 42, ln. 8-10)

As an American citizen, Ana has a direct cause of action under section 1605A. She has suffered in many ways from the attack. Her family life has been permanently disrupted and her childhood and past relationship with her parents and siblings has been marred. Ana is therefore entitled to the following award for each of the following claims enumerated in plaintiffs' Complaint:

1. first claim for relief (for damages under 28 U.S.C. § 1605A(c)); namely, that defendants provided material support and resources which caused and facilitated the Lod Airport Attack;

2. fourth claim for relief; namely, that defendants' behavior (a) was intended to and did in fact terrorize Ana and cause her severe emotional distress, (b) was willful, outrageous,

egregious, and dangerous to human life, and violated applicable criminal law, all international standards of civilized human conduct and common decency, and (c) was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, warranting an award of punitive damages;

3.   fifth claim for relief; namely, (a) that the murder of Carmelo by the JRA caused Ana to be deprived of the services, society and solatium of her deceased father, and to suffer severe mental anguish, bereavement and grief, and injury to her feelings, and (b) that defendants' conduct as specified here was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, and therefore Ana is entitled to an award of punitive damages against defendants;

4.   eighth claim for relief; namely, that defendants knowingly and willingly conspired, planned and agreed to sponsor and provide material support and resources for the commission of acts of extrajudicial killing by terrorist organizations, including the attack at the airport in which Carmelo was killed, and as a result and by reason of the death of Carmelo, which was caused by defendants' conspiracy described here, Ana suffered the damages enumerated here; and

5.   ninth claim for relief; namely, that defendants knowingly and willingly carried out tortious acts in concert with others pursuant to a common design, which resulted in extrajudicial

killings by terrorist organizations, including the Lod Airport
Attack at the airport in which Carmelo was killed and, as a result
and by reason of the death of Carmelo, which was caused by
defendants' aiding and abetting described here, Ana suffered the
damages enumerated here.

        The analysis detailed above regarding awards to direct
terror victims and relatives of victims is applicable to Ana.  Like
the rest of her family, Ana has been harmed on many levels by the
Lod Airport Attack.  She lost a loving and devoted father,
witnessed her mother become permanently depressed and disabled,
suffers the trauma of the JRA's murder of her father, and endures
the daily disruption to her family life and her relationship with
her parents and siblings.  Accordingly, Ana is awarded $5,000,000
as compensatory damages.  Defendants are jointly and severally
liable for the full amount of Ana's compensatory damages.

**G.  Hilda Calderon-Cardona**

    Hilda Calderon-Cardona ("Hilda") is a citizen of the United
States (Exhibit No. 32) and resides in Puerto Rico.  From the time
of her father's death, Hilda has experienced emotional pain and
suffering, loss of her father's society, companionship, comfort,
advice and counsel and has suffered severe mental anguish and
extreme emotional distress.

    Hilda testified at trial that she had fond memories of her
childhood and had a very "affectionate" relationship with her

father who would often play with her and her siblings.  (Trial
Transcript, Dec. 3, 2009, p. 45, ln. 3-5)  She stated that "on
Saturdays, he [Carmelo] would sit on the porch and would talk --
even while -- when we were married, he would sit on the porch on
Saturdays and talk and remembering things from our past.  And even
married, we'd go out together as a group.  Go to the countryside to
visit family.  And it was a very close relationship."  (Trial
Transcript, Dec. 3, 2009, p. 45, ln. 6-11)

Hilda also testified that, after giving birth to her children,
she has fond memories of visiting her parents together with her
daughters, and that Carmelo "would pick up my youngest daughter,
she was a year old -- three years old at that time, and he called
her Chispita, and he would raise her up in his arms, and she would
be very happy."  (Trial Transcript, Dec. 3, 2009, p. 44, ln. 17-22)

Hilda expressed her sadness that her younger children missed
the opportunity to know their grandfather, Carmelo, because he "was
a great example for all of us," (Trial Transcript, Dec. 3, 2009,
p. 47, ln. 23-24), but she is happy that her older children
remember him fondly.

She recalled at trial that she felt feeling "devastated" upon
learning of Carmelo's murder, and that as soon as she learned the
terrible news, she "without even knowing what I was doing, I went
to my mother's house" to grieve with the rest of her family.
(Trial Transcript, Dec. 3, 2009, p. 46, ln. 18-22).  Hilda stated

that when she arrived to Eladia's home, Gloria was in the room with their mother and right away said to her, "You can't cry.  You can't cry.  Remember that mom has a heart condition, so you have to calm down."  Hilda recalled that it was "impossible" for her to comply with Gloria's request.  (Trial Transcript, Dec. 3, 2009, pp. 46-47)

Hilda described the week-long wait for her father's body to arrive for burial as "terrible."  "Because what comes to mind is that you don't know how that body is going to arrive.  I mean, what happened?  You know that -- that he's dead, but you don't know how the cadaver is going to arrive, so it was a wait that was full of anguish."  (Trial Transcript, Dec. 3, 2009, p. 47, ln. 12-16)

Hilda further described the sadness that accompanied family gatherings every Saturday and during the holidays after Carmelo's murder.  She said, "The holidays weren't the same . . . I would go to -- Saturday home, it wasn't the same without him [Carmelo].  So it's -- it's a very hard feeling knowing that somebody that's no longer with you."  (Trial Transcript, Dec. 3, 2009, p. 50, ln. 2-7)

As an American citizen, Hilda has a direct cause of action under section 1605A.  She has suffered in many ways from the attack.  Her family life has been permanently disrupted and her childhood and past relationship with her parents and siblings has been marred.  Hilda is therefore entitled to the following award for each of the following claims enumerated in plaintiffs' Complaint:

1.   first claim for relief (for damages under 28 U.S.C. § 1605A(c)); namely, that defendants provided material support and resources which caused and facilitated the Lod Airport Attack;

2.   fourth claim for relief; namely, that defendants' behavior (a) was intended to and did in fact terrorize Hilda and cause her severe emotional distress, (b) was willful, outrageous, egregious, and dangerous to human life, and violated applicable criminal law, all international standards of civilized human conduct and common decency, and (c) was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, warranting an award of punitive damages;

3.   fifth claim for relief; namely, (a) that the murder of Carmelo by the JRA caused Hilda to be deprived of the services, society and solatium of her deceased father, and to suffer severe mental anguish, bereavement and grief, and injury to her feelings, and (b) that defendants' conduct as specified here was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, and therefore Hilda is entitled to an award of punitive damages against defendants;

4.   eighth claim for relief; namely, that defendants knowingly and willingly conspired, planned and agreed to sponsor and provide material support and resources for the commission of acts of extrajudicial killing by terrorist organizations, including the attack at the airport in which Carmelo was killed, and as a

result and by reason of the death of Carmelo, which was caused by defendants' conspiracy described here, Hilda suffered the damages enumerated here; and

     5.    ninth claim for relief; namely, that defendants knowingly and willingly carried out tortious acts in concert with others pursuant to a common design, which resulted in extrajudicial killings by terrorist organizations, including the Lod Airport Attack at the airport in which Carmelo was killed and, as a result and by reason of the death of Carmelo, which was caused by defendants' aiding and abetting described here, Hilda suffered the damages enumerated here.

     The analysis detailed above regarding awards to direct terror victims and relatives of victims is applicable to Hilda. Like the rest of her family, Hilda has been harmed on many levels by the Lod Airport Attack.  She lost a loving and devoted father, witnessed her mother become permanently depressed and disabled, suffers the trauma of the JRA's murder of her father, and endures the daily disruption to her family life and her relationship with her parents and siblings.  Accordingly, Hilda is awarded $5,000,000 as compensatory damages.  Defendants are jointly and severally liable for the full amount of Hilda's compensatory damages.

## H.   Salvador Calderon-Martinez

     Salvador Calderon-Martinez ("Salvador") is a citizen of the United States (Exhibit No. 38) and resides in Puerto Rico.  From

the time of his father's death, Salvador experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

Salvador is the oldest of three children from Carmelo's first marriage. (Trial Transcript, Dec. 3, 2009, p. 62, ln. 7-8) Salvador could not testify at trial because he is 95 years old, is a diabetic with high blood pressure and a weak heart, and therefore does not leave home anymore. (Trial Transcript, Dec. 3, 2009, p. 141, ln. 17-21)

Salvador stated in a written declaration executed in November 2007 (Exhibit No. 29) that he maintained a "close relationship" with his father throughout his life but also remained "very connected" with his siblings and half-siblings. He stated that Carmelo was a "strong force" in his life. (Exhibit No. 29, ¶ 3)

Salvador said that Carmelo "helped create the solid core of our family. We all respected and admired him. His opinion mattered a lot to me and my siblings. He loved and respected us all, and we loved and respected him." (Exhibit No. 20, ¶ 4)

Regarding the Lod Airport Attack, Salvador stated, "Finally, we received the terrible confirmation that our father was truly dead. It was truly one of the saddest days of my life. Suddenly, I had no father. My life was forever changed. I wondered how I could go on without him." (Exhibit No. 29, ¶ 8)

It is very difficult for Salvador to think about his father's murder.  He said that "the fact that my father was killed is always with me.  Losing my father so suddenly and in such a cruel way has always been difficult to cope with.  It is something I have never gotten over."  (Exhibit No. 29, ¶ 13)

At trial Luz testified that Salvador was very close to Carmelo and all of the siblings from Carmelo's second marriage.  Salvador lived in New York for some time, but when he moved back to Puerto Rico he "would always visit my Dad [Carmelo] at home, and we had a lot of love for Salvador."  (Trial Transcript, Dec. 3, 2009, p. 62, ln. 11)  Luz further testified that even after Carmelo's death Salvador "would always ask for my father."  (Trial Transcript, Dec. 3, 2009, p. 62, ln. 15-17)

Ruth also testified at trial that Salvador had a "very good relationship" with Carmelo.  (Trial Transcript, Dec. 3, 2009, p. 9, ln. 21)

Salvador concluded his written statement by saying, "It is very difficult for me to express my profound sadness in losing my father in such a terrible way.  I miss him very much and wish that I had been able to share many more years with him."  (Exhibit No. 29, ¶ 14)

As an American citizen, Salvador has a direct cause of action under section 1605A.  He has suffered in many ways from the attack. His family life has been permanently disrupted and his childhood

and past relationship with his parents, siblings and half siblings has been marred.  Salvador is therefore entitled to the following award for each of the following claims enumerated in plaintiffs' Complaint:

1.   first claim for relief (for damages under 28 U.S.C. § 1605A(c)); namely, that defendants provided material support and resources which caused and facilitated the Lod Airport Attack;

2.   fourth claim for relief; namely, that defendants' behavior (a) was intended to and did in fact terrorize Salvador and cause him severe emotional distress, (b) was willful, outrageous, egregious, and dangerous to human life, and violated applicable criminal law, all international standards of civilized human conduct and common decency, and (c) was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, warranting an award of punitive damages;

3.   fifth claim for relief; namely, (a) that the murder of Carmelo by the JRA caused Salvador to be deprived of the services, society and solatium of his deceased father, and to suffer severe mental anguish, bereavement and grief, and injury to his feelings, and (b) that defendants' conduct as specified here was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, and therefore Salvador is entitled to an award of punitive damages against defendants;

4.   eighth claim for relief; namely, that defendants knowingly and willingly conspired, planned and agreed to sponsor and provide material support and resources for the commission of acts of extrajudicial killing by terrorist organizations, including the attack at the airport in which Carmelo was killed, and as a result and by reason of the death of Carmelo, which was caused by defendants' conspiracy described here, Salvador suffered the damages enumerated here; and

5.   ninth claim for relief; namely, that defendants knowingly and willingly carried out tortious acts in concert with others pursuant to a common design, which resulted in extrajudicial killings by terrorist organizations, including the Lod Airport Attack at the airport in which Carmelo was killed and, as a result and by reason of the death of Carmelo, which was caused by defendants' aiding and abetting described here, Salvador suffered the damages enumerated here.

The analysis detailed above regarding awards to direct terror victims and relatives of victims is applicable to Salvador. Like the rest of his family, Salvador has been harmed on many levels by the Lod Airport Attack. He lost a loving and devoted father, suffers the trauma of the JRA's murder of his father, and endures the daily disruption to his family life and his relationship with his parents, siblings and half-siblings. Accordingly, Salvador is awarded $5,000,000 as compensatory

damages.  Defendants are jointly and severally liable for the full amount of Salvador's compensatory damages.

## I.    The Estates of Carmelo Calderon-Molina and Eladia Cardona-Rosario

Although Carmelo's estate is named as a plaintiff in this action, it appears that he did not experience any conscious pain before dying.  Nor did Carmelo, who was retired at the time of his murder, suffer a loss of future income.

Accordingly, plaintiffs have not sought an award of damages for Carmelo's estate.

By contrast, Carmelo's murder caused his wife, Eladia severe compensable harm.  The relationship between Carmelo and Eladia was "[v]ery good."  (Trial Transcript, Dec. 3, 2009, p. 11, ln. 7-9). Carmelo and Eladia had a loving marriage.  (Declaration of Luis Calderon-Cardona, Exhibit No. 26, at ¶ 6.)  The news of Carmelo's death caused Eladia such severe anguish that she had to be continuously and heavily sedated for approximately a week after the murder as well as during the funeral, out of concern that, due to the condition of her heart and blood pressure, her life was in danger.  (Id. at p. 24, ln. 17-25; p. 38, ln. 24 – p. 39, ln. 5; p. 40, ln. 3-10; p. 46 ln. 24 – p. 47, ln. 3; p. 49, ln. 1-5; p. 60, ln. 20 – p. 61. ln. 1; Declaration of Ruth Calderon-Cardona, Exhibit No. 27, at ¶ 17; Declaration of Luz Calderon-Cardona, Exhibit No. 28, at ¶¶ 7-8)  The loss of her husband was "monumental" (Exhibit No. 28 at ¶ 13) and affected Eladia

"tremendously" (Trial Transcript, Dec. 3, 2009 at p. 29, ln. 13-17), and she was continuously sad for an extended period after the murder, particularly whenever Carmelo would be mentioned. (Id. at p. 50, ln. 8-18). Eladia suffered particularly at night, and experienced frequent nightmares in which Carmelo appeared to her. (Exhibit No. 28 at ¶ 13)  After the murder, Eladia became heavily dependant on her children. (Exhibit No. 27 at ¶ 26; Exhibit No. 28 at ¶ 12)

As an American citizen, Eladia's estate has a direct cause of action under section 1605A. Eladia's estate is therefore entitled to the following award for each of the following claims enumerated in plaintiffs' Complaint:

1. first claim for relief (for damages under 28 U.S.C. § 1605A(c)); namely, that defendants provided material support and resources which caused and facilitated the Lod Airport Attack;

2  fourth claim for relief; namely, that defendants' behavior (a) was intended to and did in fact terrorize Eladia and cause her severe emotional distress, (b) was willful, outrageous, egregious, and dangerous to human life, and violated applicable criminal law, all international standards of civilized human conduct and common decency, and (c) was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, warranting an award of punitive damages;

3.   fifth claim for relief; namely, (a) that the murder of Carmelo by the JRA caused Eladia to be deprived of the services, society and solatium of her husband, and to suffer severe mental anguish, bereavement and grief, and injury to her feelings, and (b) that defendants' conduct as specified here was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, and therefore Eladia's estate is entitled to an award of punitive damages against defendants;

4.   eighth claim for relief; namely, that defendants knowingly and willingly conspired, planned and agreed to sponsor and provide material support and resources for the commission of acts of extrajudicial killing by terrorist organizations, including the attack at the airport in which Carmelo was killed, and as a result and by reason of the death of Carmelo, which was caused by defendants' conspiracy described here, Eladia suffered the damages enumerated here; and

5.   ninth claim for relief; namely, that defendants knowingly and willingly carried out tortious acts in concert with others pursuant to a common design, which resulted in extrajudicial killings by terrorist organizations, including the Lod Airport Attack at the airport in which Carmelo was killed and, as a result and by reason of the death of Carmelo, which was caused by defendants' aiding and abetting described here, Eladia suffered the damages enumerated here.

The analysis detailed above regarding awards to direct terror victims and relatives of victims is applicable to Eladia. Like the rest of her family, Eladia was harmed on many levels by the Lod Airport Attack.  She lost a loving and devoted husband, suffered the trauma of the JRA's murder of her husband, and endured severe grief.

Under the "general framework for compensatory awards for family members of victims who were killed as a result of terrorist activity" established by the federal courts, spouses of such victims are typically awarded $8 million.  Acosta, 574 F. Supp. 2d at 29.

This Court finds no reason to depart from this formula.

Accordingly, Eladia's estate is awarded $8,000,000 as compensatory damages.  Defendants are jointly and severally liable for the full amount of Eladia's compensatory damages.

Ruth Calderon-Cardona is a citizen of the United States (Exhibit No. 36) and has been identified as responsible for the estates of Carmelo Calderon-Molina and Eladia Cardona-Rosario in this matter.  Therefore, the award to Eladia's estate set forth above shall be made to Ruth Calderon-Cardona, in Ruth's capacity as the personal representative of Eladia's estate, to be distributed equally among the members of Eladia's estate.

**J.   Angel Calderon-Guzman and Miguel Calderon-Guzman on behalf of the Estate of their Father, Miguel Calderon-Cardona**

Miguel Calderon-Cardona ("Miguel") was a citizen of the United States (Exhibit No. 35) and resident of Puerto Rico on May 30, 1972.  He died in 1982.  (Exhibit No. 40)  Miguel was a police officer who was killed in the line of duty while attempting to thwart a robbery.  (Trial Transcript, Dec. 3, 2009, p. 65, ln. 10-17)

Prior to his death, Miguel experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel and had suffered severe mental anguish and extreme emotional distress.

Hilda testified at trial that the death of Carmelo affected Miguel the most of all the children, because he was the youngest and at that time was still living at home with Carmelo and Eladia. (Trial Transcript, Dec. 3, 2009, p. 52, ln. 2-6)  Hilda described Miguel as a "very happy" person prior to the Lod Airport Attack. She said that Miguel "was the one that would bring life to the parties . . . he was the one that sort of would give life to the house.  And after that [the Lod Airport Attack], well, he wasn't the same.  After it, he wasn't the same."  (Trial Transcript, Dec. 3, 2009, p. 52, ln. 7-11)

Luz testified at trial that Miguel's relationship with Carmelo was "very good," and that he reacted to his father's murder "how we

all reacted, with a lot of pain and sadness." (Trial Transcript, Dec. 3, 2009, p. 70, ln. 16-21)

Because Miguel was an American citizen, his Estate has a direct cause of action under section 1605A. Miguel suffered in many ways from the attack. His family life was permanently disrupted and his childhood and past relationship with his parents and siblings were marred. Miguel's Estate is therefore entitled to the following award under each of the following claims enumerated in plaintiffs' Complaint:

1. first claim for relief (for damages under 28 U.S.C. § 1605A(c)); namely, that defendants provided material support and resources which caused and facilitated the Lod Airport Attack;

2. fourth claim for relief; namely, that defendants' behavior (a) was intended to and did in fact terrorize Miguel and cause him severe emotional distress, (b) was willful, outrageous, egregious, and dangerous to human life, and violated applicable criminal law, all international standards of civilized human conduct and common decency, and (c) was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, warranting an award of punitive damages;

3. fifth claim for relief; namely, (a) that the murder of Carmelo by the JRA caused Miguel to be deprived of the services, society and solatium of his deceased father, and to suffer severe mental anguish, bereavement and grief, and injury to his feelings,

and (b) that defendants' conduct as specified here was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, and therefore Miguel is entitled to an award of punitive damages against defendants;

4.    eighth claim for relief; namely, that defendants knowingly and willingly conspired, planned and agreed to sponsor and provide material support and resources for the commission of acts of extrajudicial killing by terrorist organizations, including the attack at the airport in which Carmelo was killed, and as a result and by reason of the death of Carmelo, which was caused by defendants' conspiracy described here, Miguel suffered the damages enumerated here; and

5.    ninth claim for relief; namely, that defendants knowingly and willingly carried out tortious acts in concert with others pursuant to a common design, which resulted in extrajudicial killings by terrorist organizations, including the Lod Airport Attack at the airport in which Carmelo was killed and, as a result and by reason of the death of Carmelo, which was caused by defendants' aiding and abetting described here, Miguel suffered the damages enumerated here.

        The analysis detailed above regarding awards to direct terror victims and relatives of victims is applicable to the Estate of Miguel as well.  Like the rest of his family, Miguel was harmed on many levels by the Lod Airport Attack.  He lost a loving and

devoted father, witnessed his mother become permanently depressed
and disabled, suffered the trauma of the JRA's murder of his
father, and endured the daily disruption to his family life and his
relationship with his parents and siblings.   Accordingly, the
members of Miguel's Estate are awarded $5,000,000 as compensatory
damages, to be divided equally among the members of the Estate.
Defendants are jointly and severally liable for the full amount of
those compensatory damages.

**K.    Pablo Tirado-Ayala**

Pablo Tirado-Ayala ("Pablo") was a citizen of the United
States (Exhibit No. 43) and resides in Puerto Rico.

Angel Ramirez Colon ("Angel"), was raised as a son from the
age of six months[27] by Pablo and Antonia, his aunt and step-father,
(Trial Transcript, Dec. 3, 2009, p. 82, ln. 12-17).   There was one
other child in the family, Miguel Angel, who tragically died in a
house fire at the age of 12.   (Trial Transcript, Dec. 3, 2009,
pp. 83-84)

Angel testified at trial that growing up in the house of Pablo
and Antonia was "very good," because "they opened their home to me,
and all the love they had, they deposited in me.   I was the only

---

[27] Antonia is the sister of Angel's biological father and Pablo
is Angel's stepfather.   However, for all intents and purposes,
Angel testified in court that "They're [Pablo and Antonia] my
parents.   They're who raised me." (Trial Transcript, Dec. 3, 2009,
p. 82, ln. 12-13)

one there, and they deposited all their love in me." (Trial Transcript, Dec. 3, 2009, p. 85, ln. 20-23)

Prior to the Lod Airport Attack, Pablo, Antonia, and Angel would travel to various places including "Mexico, Magic Kingdom, New York, Dominican Republic." (Trial Transcript, Dec. 3, 2009, p. 86, ln. 2-3) They would also go out locally on a regular basis, such as to baseball games, the beach, and on tours. (Trial Transcript, Dec. 3, 2009, p. 87, ln. 5-6) Angel testified at trial that Pablo was "very happy" planning for his upcoming trip to the Holy Land. In fact, it was the main topic in the house. Antonia did not contemplate joining Pablo because Angel was still at home (at age 16) and she did not want to leave him alone. (Trial Transcript, Dec. 3, 2009, p. 90, ln. 2-10.) The night before departing Pablo could not sleep because he was full of anticipation of visiting the Holy Land. (Trial Transcript, Dec. 3, 2009, p. 90, ln. 2-10)

Upon Pablo's return from his trip to Israel, Angel found a very different father. Angel says that "Pablo wouldn't speak, in the house he would almost always be in the room, he would just come out for minutes, and he wouldn't talk, and he would return to his room." (Trial Transcript, Dec. 3, 2009, p. 92, ln. 5-7.) After the Lod Airport Attack, Pablo was hospitalized in a mental institution for more than a month, but according to Angel he did

not make any significant improvement.  (Trial Transcript, Dec. 3, 2009, pp. 92-93)

Angel testified that for a year or so after the Lod Airport Attack, Pablo was unable to sleep if he wasn't medicated.  And even when Pablo slept, he would wake up screaming.  (Trial Transcript, Dec. 3, 2009, p. 93, ln. 8-12)

The Lod Airport Attack markedly changed Pablo's personality. "He wasn't very approachable, as he was before," testified Angel (Trial Transcript, Dec. 3, 2009, p. 94, ln. 1-2).  Pablo lost between 60-80 pounds after the Lod Airport Attack, a significant weight loss for him.  (Trial Transcript, Dec. 3, 2009, p. 95, ln. 25.)  Pablo would speak very little.  "And he didn't work - he practically lost the capability to function at work," said Angel. (Trial Transcript, Dec. 3, 2009, p. 93, ln. 17-18)

Pablo's significant change in behavior also terribly affected his wife, Antonia.  She found his changes so difficult "because the person to talk to, who would spend time with us, who would go out with us, that main provider, he wasn't there anymore."  (Trial Transcript, Dec. 3, 2009, p. 94, ln. 3-7)  Pablo never traveled outside of Puerto Rico again.  Trial Transcript, Dec. 3, 2009, pp. 94-95)

Antonia would be protective of Pablo and make sure that no one would raise the topic of the Lod Airport Attack around Pablo, because, explained Angel, "if that happened, then he [Pablo] could

go into a crisis or into a depression again." (Trial Transcript, Dec. 3, 2009, p. 94, ln. 1-17)

**Psychological Evaluation of Pablo by Dr. Alexandra Ramos-Duchateau**

As a result of the Lod Airport Attack, Pablo suffers from medical conditions that precluded his ability to testify at trial. He has a medical certificate stating that he currently has Alzheimer's, diabetes, is blind, bedridden, and unable to ambulate or communicate. A declaration executed by Pablo in the context of the D.C. Action (but never submitted to the D.C. District Court) was submitted to this Court in lieu of Pablo's live testimony. (Exhibit No. 46)  This written declaration, along with Angel's testimony at trial, was supported by the testimony and written evaluation[28] of Dr. Alexandra Ramos-Duchateau ("Dr. Ramos"), a clinical and forensic psychologist. (Exhibit No. 10)

Dr. Ramos holds a bachelor's degree in Psychology from Princeton University. She also has a master's and doctoral degrees from the University of Illinois Urbana-Champaign. After receiving a doctoral degree, it is customary to do an internship, which Dr. Ramos did at the University of Illinois-Chicago. Subsequent to

---

[28] Dr. Ramos reviewed the written declaration of Pablo Tirado-Ayala dated November 16, 2007. (Exhibit 46) She also read a newspaper article titled, "La Matanza de Tel Aviv" and a newspaper article from The New York Times dated June 4, 1972. Dr. Ramos had the opportunity to interview Angel. She also visited Pablo at the nursing home, but at the time of the evaluation he was bedridden, unable to speak, blind, and required assistance through a feeding tube, so she was unable to interview him directly. (Trial Transcript, Dec. 3, 2009, pp. 105-106)

her internship, Dr. Ramos engaged in postdoctoral studies at the University of Texas in Dallas, and later began a private practice in Puerto Rico.  (Exhibit No. 9)

Dr. Ramos testified at trial that from the data she evaluated, it is her opinion that Pablo has, since the time of the Lod Airport Attack, suffered from Post-Traumatic Stress Disorder and Major Depressive Disorder.  Dr. Ramos stated that Pablo met all the symptoms criteria for those two diagnoses, especially right after Lod Airport Attack, but also throughout the rest of his life. (Trial Transcript, Dec. 3, 2009, p. 110, ln. 22-25)

Dr. Ramos assigned Pablo a score of 30 on the Global Assessment Functioning Scale ("GAF"),[29] which represents severe impairment in normal functioning.  (Trial Transcript, Dec. 3, 2009, p. 126, ln. 8-9)

Dr. Ramos found, from Pablo's sworn statement and from the descriptions provided by Angel and Antonia, that Pablo's life was defined by the Lod Airport Attack.  She stated:

> It's almost - it's before the terrorist attack, and after; his life drastically changed in many ways.  He never worked again.  He became socially isolated, he became withdraw, depressed, he lost a tremendous amount of weight, his functioning in society was severely compromised; and from the date of - that I gathered, he

---

[29] The GAF measures whether a person is capable of normal functioning in a wide range of activities on a scale of 0-100.  A score of 100 represents superior functioning in a wide range of activities.  A score of 30 represents serious impairment in communication or judgment or the inability to function in almost all areas.  (Trial Transcript, Dec. 3, 2009, p. 126, ln. 10-23)

never returned to his pre-terrorist attack functioning.
So it is my impression that it [the Lod Airport Attack]
was devastating in every sense of the word.
Economically, in terms of his family, and in his marriage
relationship . . . But from the data, it appear that his
symptoms never went away completely.  So he never fully
recovered.  He may have had periods of improvement, but
he never achieved the element of functioning that he had
before the terrorist attack." (Trial Transcript, Dec. 3,
2009, p. 109, ln. 19 - p. 110, ln. 13-16)

At trial, Dr. Ramos also addressed the issue of whether trauma
experienced from Miguel Angel's death could have been the cause of
Pablo's severe disorders.  She stated that the trauma of Miguel
Angel's death certainly was a blow to Pablo and Antonia, but that
after his death "the family was able to achieve some sort of normal
normalcy [sic], and that it eventually was functioning again.  They
[Pablo and Antoina] were both working.  They were still having a
social life.  They were enjoying the time with their family before
the incident of the terrorist attack."  (Trial Transcript, Dec. 3,
2009, pp. 107-108)  Dr. Ramos stated that Pablo and Antonia's
family life "was also functioning relatively well at the time of
the terrorist attack.  He [Pablo] was sharing with family.  He was
involved in many activities.  He had plans for the future.  He was
working."  (Trial Transcript, Dec. 3, 2009, p. 117, ln. 15-24)  All
of these things changed significantly after Pablo suffered the
traumatic events of the Lod Airport Attack.

According to Dr. Ramos, one of the more telling portions of
Pablo's written declaration is his vivid recollection of the Lod

Airport Attack itself.  At trial Dr. Ramos quoted from Pablo's description of the attack:

> As the shooting continues, people were yelling and running around. It was frightening and overwhelming. I couldn't just stand there so I began to run, frantically looking for an exit, but I couldn't find the door.  I just knew I had to get out of there. I was very confused and my panic increased every second.  As I ran looking for a place to escape, I saw blood everywhere.  On the floor, I saw dead bodies and injured people.  It was a horrible scene and full of images that I will never forget.  And while I was running in all directions, I think I saw the terrorists themselves.  But I kept running, looking for a way out. It was too much for me to comprehend at one time."  (Trial Transcript, p. 108, ln. 22 - p. 109, ln. 8)

Dr. Ramos testified that this detailed description by Pablo was provided 35 years after the Lod Airport Attack, yet describes in an extremely vibrant manner "a scene of horror and panic," and that such a clear recollection so long after the event itself indicates the profound effect it had on Pablo's life.  (Trial Transcript, p. 109, ln. 10-15)

As an American citizen, Pablo has a direct cause of action under section 1605A.  Pablo is therefore entitled to the following award for each of the following claims enumerated in plaintiffs' Complaint:

1.   first claim for relief (for damages under 28 U.S.C. § 1605A(c)); namely, that defendants provided material support and resources which caused and facilitated the Lod Airport Attack;

2.   fourth  claim  for  relief;  namely,  that  defendants'
behavior (a) was intended to and did in fact terrorize Pablo and
cause him severe emotional distress, (b) was willful, outrageous,
egregious, and dangerous to human life, and violated applicable
criminal  law,  all  international  standards  of  civilized  human
conduct and common decency, and (c) was outrageous in the extreme,
wanton,  willful  and  malicious,  and  constituted  a  threat  to  the
public at large, warranting an award of punitive damages;

3.   fifth claim for relief; namely, that defendants' conduct
as specified here was outrageous in the extreme, wanton, willful
and malicious, and constituted a threat to the public at large, and
therefore Pablo is entitled to an award of punitive damages against
defendants;

4.   sixth claim for relief; namely (a) that the Lod Airport
Attack constituted a battery on the person of Pablo, (b) that the
Lod  Airport  Attack  caused  Pablo  physical  and  psychological
injuries,  extreme  pain,  suffering  and  severe  financial  loss,
including  deprivation  of  present  and  future  income,  (c)  that
defendants' actions were willful, malicious, intentional, reckless,
and unlawful and were the proximate cause of the Lod Airport Attack
and the battery on the person of Pablo, and the injuries plaintiffs
suffered there, and (d) that defendants' conduct was outrageous in
the  extreme,  wanton,  willful  and  malicious,  and  constituted  a
threat to the public warranting an award of punitive damages; and

5.    seventh claim for relief; namely (a) The Lod Airport Attack and the ensuing carnage caused plaintiffs fear and apprehension of harm and death, and actual physical harm, and constituted assaults on Pablo, (b) the Lod Airport Attack and assaults on their persons, which were direct and proximate results of defendants' actions, caused Pablo extreme mental anguish and actual physical injury and pain and suffering.

The above analysis of case law regarding the calculation of damages (for the harm suffered, pain awards, etc.) applies as well to Pablo.  The Lod Airport Attack had a horrendous impact on Pablo and his family, all in addition to having been subjected to the JRA's violent attack, being injured, and having to deal with the murder of several friends.  While Pablo luckily escaped significant physical harm from the shooting, he was reminded daily of coming under fire himself and watching innocent people be murdered.  Pablo had been further victimized, as described above, by the severe impact on his marriage and relationship with his children.  Pablo, by way of his estate, is therefore awarded $15,000,000 as compensatory damages.  Defendants are jointly and severally liable for the full amount of Pablo's compensatory damages.

## L.   **Antonia Ramirez-Fiero**

Antonia Ramirez-Fiero ("Antonia") is a citizen of the United States (Exhibit A to Exhibit No. 47) and resides in Puerto Rico.

Although Antonia did not experience the horror of the Lod Airport Attack directly, she is a victim who has suffered almost as much from its fallout as her husband Pablo suffered.   Angel testified at trial that the Lod Airport Attack had very significant affects on Antonia's life.   He said that after the Lod Airport Attack, "she [Antonia] would have to dedicate all her time basically with him [Pablo], making sure that he would eat, he would be medicated -- it wasn't easy." (Trial Transcript, Dec. 3, 2009, p. 98, ln. 6-8)

In Antonia's written declaration (Exhibit No. 47),[30] Antonia describes her life before the Lod Airport Attack in very positive terms.  She says that Pablo was "strong, healthy and happy.  He had confidence and took charge of our household.  He would work each day and was a stable provider.  Those who knew Pablo knew him to be a good man.  Pablo had always been solid and secure, and you could depend on him.  I could depend on him to provide me assistance in all of our personal activities.  He was a caring husband, and he found strength in his religion."  (Exhibit No. 47, ¶ 8)

Antonia also explained how her health also suffered from the Lod Airport Attack.  She stated, "Like Pablo, I was a strong and healthy person before the terrorist attack.  After his return, I

---

[30] A written declaration was provided by Antonia in the context of the D.C. Action (but never submitted to that court) and has been introduced to the Court in lieu of her live testimony as Exhibit No. 47.

was often very nervous and became upset easily.  I was very sad.

I had health problems that developed because of the stress, strain,

and sadness that I felt over my husband's deteriorating condition."

(Exhibit No. 47, ¶ 12)

Antonia stated further, "Before the attack, I had been a

married woman in a stable loving relationship with a fine man.  He

was a solid provider, and we had a wonderful life.  He was the one

who took care of me.  After the attack, my husband changed, and so

did our relationship and my life.  I now have to care for him each

and every day, often like a nurse, and I have to be strong around

him in my attempts to ease his pain.  Instead of having a

relationship that grew and was filled with more and more happy

memories like other happily married couples, ours was constantly

affected by Pablo's worsening emotional health problems and our

attempts to cope.  In many ways, I have to take charge of the

household and take on all kinds of responsibilities and tasks that

Pablo had carried out before the attack."  (Exhibit No. 47, ¶ 13)

Before the Lod Airport Attack, Antonia said that she would

have described her life with Pablo as a couple that was happily

looking forward to the years ahead.  In addition to visiting with

friends often, Pablo and Antonia enjoyed travel.  After the Lod

Airport Attack, however, they never again left the island of Puerto

Rico.  Pablo spent most days at home and socialized with others

less and less.  Both Antonia and Pablo were scared to travel and

often cried.  Their lives became full of doctors' appointments.
(Exhibit No. 47, ¶ 14)

**Psychological   Evaluation   of   Antonia   by   Dr.   Alexandra
Ramos-Duchateau**

As a result of the Lod Airport Attack, Antonia suffers from
medical conditions that precluded her ability to testify at trial.
Antonia has a medical certificate stating that she suffers from
dementia, congestive heart failure, vertigo and that travel to the
Court is not recommended.  Additionally, Antonia's son Angel
testified at trial concerning the deleterious psychological effect
the Lod Airport Attack had on Antonia, and Angel's testimony and
Antonia's written declaration were supported by the testimony and
written evaluation[31] of Dr. Ramos.

Dr. Ramos testified at trial that as a result of the Lod
Airport Attack and its effects on Pablo, Antonia has struggled with
depression and anxiety.  (Trial Transcript, Dec. 3, 2009, p. 112,
ln. 3-8)  Dr. Ramos diagnosed Antonia with a Depressive Anxious
Disorder and gave her a Global Assessment Functioning Scale score
of 50 (Id., at ln. 10-11), which indicates "serious symptoms and
serious impairment."  (Id., at ln. 24-25)  Dr. Ramos stated that

---

[31] Dr. Ramos reviewed the written declaration of Antonia dated
November 16, 2007.  As noted supra, Dr. Ramos also read a newspaper
article titled, "La Matanza de Tel Aviv" and a newspaper article
from The New York Times dated June 4, 1972, a patient summary of
Antonia by Dr. Efrain Marcantoni dated October 17, 2007, and she
also had the chance to interview both Antonia and her son, Angel.
(Trial Transcript, Dec. 3, 2009, pp. 105-106)

Antonia was "very fragile, not only physically but emotionally."
(Trial Transcript, Dec. 3, 2009, p. 127, ln. 1-2)

As an American citizen, Antonia has a direct cause of action
under section 1605A. Antonia is therefore entitled to the
following awards for each of the following claims enumerated in
plaintiffs' Complaint:

1. first claim for relief (for damages under 28 U.S.C.
§ 1605A(c)); namely, that defendants provided material support and
resources which caused and facilitated the Lod Airport Attack;

2. fourth claim for relief; namely, that defendants'
behavior (a) was intended to and did in fact terrorize Antonia and
cause her severe emotional distress, (b) was willful, outrageous,
egregious, and dangerous to human life, and violated applicable
criminal law, all international standards of civilized human
conduct and common decency, and (c) was outrageous in the extreme,
wanton, willful and malicious, and constituted a threat to the
public at large, warranting an award of punitive damages; and

3. fifth claim for relief; namely, that defendants' conduct
as specified here was outrageous in the extreme, wanton, willful
and malicious, and constituted a threat to the public at large, and
therefore Antonia is entitled to an award of punitive damages
against defendants;

The analysis detailed above regarding awards to direct
terror victims and relatives of victims applies to Antonia as well.

Antonia has been harmed on many levels by the Lod Airport Attack. She has lost the benefit of a strong and loving husband, suffers the trauma of the JRA's injuring of her husband, and endures the daily disruption to her family life and her relationship with her husband.  After the Lod Airport Attack she has had to attend daily to Pablo's deteriorating state of mind, and she herself has become permanently depressed and disabled.  Her family life and marriage will never be the same and are forever impacted by Pablo's and her ongoing disabilities.  Accordingly, Antonia is awarded $10,000,000 as compensatory damages.  Defendants are jointly and severally liable for the full amount of Antonia's compensatory damages.

## Punitive Damages

In numerous previous civil terrorism cases tried under FSIA, federal courts have awarded punitive damages in order to punish defendants, and as a means of deterring future terrorist acts. Typically, courts have imposed punitive damage of three times of a state sponsor's annual budget for the export of terrorism.  Acosta v. The Islamic Republic of Iran, 574 F. Supp. 2d 15, 31 (D.D.C. 2008), Bodoff v. Islamic Republic of Iran, 424 F. Supp. 2d 74, 89 (D.D.C. 2006); Stern v. Islamic Republic of Iran, 271 F. Supp. 2d 286, 301 (D.D.C. 2003); Cronin v. Islamic Republic of Iran, 238 F. Supp. 2d 222, 235-36 (D.D.C. 2002), abrogated on other grounds by Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024 (D.C.

Cir. 2004); Eisenfeld v. Islamic Republic of Iran, 172 F. Supp. 2d
1, 9 (D.D.C. 2000).

North Korea's demonstrated and well-known policy to encourage,
support and direct a campaign of murder against civilians amply
justifies the imposition of punitive damages against it and the
CGIB.  North Korea's budget for the export of terrorism is not
known.  However, this Court will adopt the "typical punitive
damages award of $300 million" that has been awarded against the
Islamic Republic of Iran because "[t]here is no reason to depart
from settled case law regarding the amount of punitive damages in
terrorism cases." Brewer v. Islamic Republic of Iran, 664 F. Supp.
2d 43, 58-59 (D.D.C. 2009), see also Acosta v. Islamic Republic of
Iran, 574 F. Supp. 2d 15, 31 (D.D.C. 2008).

Accordingly, the Court will award punitive damages against
defendants in the amount of $300 million to plaintiffs collectively
to be divided equally.

## CONCLUSION

This Court possesses subject matter jurisdiction over this
action and personal jurisdiction over defendants.  Plaintiffs have
established to this Court's satisfaction, pursuant to 28 U.S.C.
§ 1608(e), and by clear and convincing evidence, that defendants
are jointly and severally liable for all the damages awarded by
this Court because of their provision of material support and
assistance to the terrorists who carried out the Lod Airport Attack

Civil No. 08-1367 (FAB)                                                    104

on May 30, 1972 in which plaintiffs were injured.  Accordingly,
plaintiffs' motion for default judgment shall be granted against
defendants and judgment shall be entered against defendants and in
plaintiffs' favor in accordance with this opinion and order.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, July 16, 2010.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE
